**In re TEXACO INC., Texaco Capital Inc., Texaco Capital N.V., Debtors.**

**Bankruptcy Nos. 87 B 20142–87 B 20144.**

United States Bankruptcy Court, S.D. New York.

Jan. 22, 1988.

**807**

Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for The State of Cal. Public Employees Retirement System.

Abbott A. Leban, Chief Counsel, Harrisburg, Pa., for Com. of Pa. Public School Employees' Retirement System.

## ICAHN GROUP MOTION FOR ORDER TERMINATING OR MODIFYING EXCLUSIVE PERIOD TO PERMIT FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

Trans World Airlines, Inc. (TWA), ACF Industries, Incorporated, Swan Management Corp. and Union Associates Corporation, a group of corporations controlled by Carl C. Icahn (hereinafter referred to collectively as the "Icahn Group"), have moved for an order terminating or modifying the exclusive periods for filing a plan pursuant to 11 U.S.C. § 1121(d). The Icahn Group seeks permission to file an alternative plan of reorganization in these jointly administered Chapter 11 cases which were commenced on April 12, 1987 by Texaco Inc. and its two wholly owned financial subsidiaries, Texaco Capital Inc. and Texaco Capital N.V. A hearing on the motion was held on January 20, 1988.

### FACTUAL BACKGROUND

1. The Texaco debtors filed their petitions for reorganizational relief on April 12, 1987 as a result of a $10.3 billion dollar judgment obtained by Pennzoil against Texaco in a state court in Texas. The Chapter 11 cases were ordered by this court to be jointly administered in accordance with Bankruptcy Rule 1015.

2. On December 2, 1987, a hearing was held in this court upon Texaco's second request to extend the exclusive periods expressed in 11 U.S.C. § 1121 for filing a plan of reorganization and soliciting acceptances for such plan. The General Committee of Unsecured Creditors had sought permission to file a "base/cap" plan under which Texaco would be required to make a nonrefundable payment to Pennzoil in exchange

Gordon Hurwitz Butowsky Weitzen Shalov & Wein, New York City, for Trans World Airlines, Inc., ACF Industries, Inc., Swan Management Corp. and Unicorn Associates Corp. (collectively the "Icahn Group").

Weil, Gotshal & Manges, Cravath, Swaine & Moore, New York City, for debtors.

Levin & Weintraub & Crames, New York City, Baker & Botts, Houston, Tex., Stutman, Treister & Glatt, P.C., Los Angeles, Cal., for Pennzoil Co.

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for Gen. Committee.

Keck, Mahin & Cate, Chicago, Ill., for Equity Committee.

for a cap on Texaco's liability, if any, to Pennzoil with respect to the Pennzoil judgment. Thus, Texaco could proceed with its request for *certiorari* in the United States Supreme Court with the certainty that Texaco would be required to pay a base amount to Pennzoil, regardless of the outcome of the litigation, but that in the event that Texaco was ultimately unsuccessful in its litigation with Pennzoil, Texaco's maximum liability would not exceed the agreed upon cap amount, rather than the principal judgment sum of $10.3 billion, together with interest on this amount. During this hearing, Mr. Charles Luce, the representative of Metropolitan Life Insurance Company, who is the Chairman of the General Committee of Unsecured Creditors, testified that Texaco had suggested base and cap figures of $500 million and $3 billion; that Pennzoil had suggested figures of $1.5 billion and $4.5 billion; and that the General Committee had suggested figures of $1 billion and $3.5 billion.

3. The court then ruled from the bench that it would extend the exclusive 120 day and 180 day periods under 11 U.S.C. § 1121(d) to January 11, 1988 for filing a plan, and to March 11, 1988 for soliciting and obtaining acceptances for any plan filed by January 11, 1988. The court also ruled that it would be willing to terminate the exclusivity periods on motion if the statutory committees and Pennzoil could agree unconditionally to a base/cap plan, provided that Texaco was given an opportunity to have input with respect to the negotiations.

4. Prior to the December 2, 1987 hearing, the Icahn Group had become one of the largest holders of Texaco stock as a result of purchases effected in November of 1987 by Carl Icahn, through his control of TWA and his other entities in the Icahn Group. Consequently, Icahn participated in the various negotiations that were being held for the purpose of enlisting Pennzoil's unconditional agreement to a plan of reorganization that might be submitted by the statutory committees in furtherance of this court's expression of willingness to entertain a plan to which Pennzoil would consent. Pennzoil's consent was required because, absent such consent, Pennzoil would have to receive 100% of its judgment claim before the Texaco shareholders could retain their interests within the meaning of the modified absolute priority rule, as expressed in 11 U.S.C. § 1129(b)(2)(B).

5. On December 8, 1987, at a hearing to settle an order with respect to this court's extension of plan exclusivity ruling of December 2, 1987, the parties requested further amplification of the court's previous ruling that Texaco's exclusivity could be modified on motion if the statutory committees and Pennzoil could agree on a base/cap plan or any other plan. The court advised the parties that if the General Committee of Unsecured Creditors, the Equity Committee and Pennzoil could agree upon a plan, with input from Texaco, the court would entertain a motion, on 48 hours' notice, to modify the exclusivity periods for the purpose of permitting the statutory committees the opportunity to file their plan, if Pennzoil agreed to consent to such plan.

6. As a result of negotiations that then ensued, Texaco and Pennzoil arrived at a settlement figure of $3 billion to be paid to Pennzoil under a plan of reorganization. It was also agreed that all of the other allowed unsecured claims would be paid in full, together with interest.

7. Pursuant to the settlement Stipulation between Texaco and Pennzoil, the two companies agreed to use their best efforts to obtain confirmation of the Joint Plan that they negotiated. The parties agreed in writing that:

> Pennzoil and Texaco will use their best efforts to obtain confirmation of the Plan in accordance with the Bankruptcy Code as soon as practicable in [Texaco's Chapter 11] Case. Pennzoil and Texaco will take all necessary actions to achieve confirmation including, in the case of Texaco, recommending to shareholders, that the Plan be confirmed. Pennzoil and Texaco shall not agree to consent to, or vote for any modification of the Plan unless such modification has been agreed to by the other party. Neither Pennzoil

nor Texaco shall vote for, consent to, support or participate in the formulation of any other plan in the Reorganization Case.

The Stipulation was included in a Form 8–K Current Report, dated December 22, 1987, which Texaco filed with the Securities and Exchange Commission in connection with Texaco's announcement that it had reached an agreement with Pennzoil as to a proposed plan of reorganization in Texaco's Chapter 11 cases. The Stipulation was also described in Texaco's Disclosure Statement which it filed with this court.

8. On December 31, 1987, before the expiration of Texaco's plan exclusivity period on January 11, 1988, Texaco filed its Joint Plan of Reorganization. The Joint Plan contained an amendment to the effect that the shareholders would be deemed impaired so that their approval of the plan would be required. A disclosure statement was also filed. January 27, 1988 was set as the date for the hearing pursuant to 11 U.S.C. § 1125 with regard to any objections to the disclosure statement.

9. The time conditions expressed in the Joint Plan provide for an approval of the disclosure statement by February 10, 1988; confirmation must occur by March 30, 1988; the effective date of the Joint Plan must occur by April 14, 1988 and the United States Supreme Court must not have ruled on any petition for a writ of *certiorari* that may have been applied for by Texaco with respect to the Pennzoil judgment.

10. The Icahn Group requests a termination or modification of the plan exclusivity periods so as to allow the Icahn Group to file an alternative plan of reorganization. The Icahn Group's proposed alternative plan of reorganization is substantially the same as the Joint Plan, except that it includes certain proposed amendments to further "corporate democracy". The proposed plan seeks to amend Texaco's Certificate of Incorporation and By–Laws so as to permit shareholders to act by written consent of a majority of the outstanding shares; to permit shareholders to call a special meeting upon request of 10% of the outstanding shares; to remove the staggered elections of directors; to eliminate the requirement of an 80% vote of the outstanding shares to remove a director; to eliminate the percentage of shareholder votes necessary to amend the Certificate of Incorporation or By–Laws; to eliminate the existing poison pill provisions and to prohibit any employee compensation plan based on a change in control of Texaco.

11. The corporate governance provisions suggested by the Icahn Group do not address any bankruptcy issues that relate to an effective Chapter 11 reorganization. The issues raised by the Icahn Group do not involve the relationship between the debtors and their creditors, nor do the corporate governance proposals involve the relationship between the debtors' creditors and their shareholders. The Ichan Group's proposals deal solely with the rights of shareholders among themselves, notwithstanding the fact that the Texaco Joint Plan makes no changes as to the debtors' Certificate of Incorporation or their By–Laws. All of the debtors' shareholders are accorded under the Texaco Joint Plan the same rights they possessed before the commencement of the Chapter 11 cases. The Texaco Joint Plan does not disturb the voting power of shareholders or their rights with respect to the selection of directors or officers of the debtors.

## EXCLUSIVITY

Pursuant to 11 U.S.C. § 1121(b), only the debtor in possession may file a plan within the 120–day exclusivity period or any extensions authorized by the court. It was intended that at the outset of a Chapter 11 case a debtor should be given the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests. H.R.Rep. No. 595, 95th Cong., 2d Sess. 221–222 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787. Pursuant to orders of this court, Texaco's exclusivity period for filing a plan of reorganization was extended to January 11, 1988. This extension carried with it the additional 60–day period permitted under 11 U.S.C. § 1121(c)(3) for Texaco to solicit and obtain

acceptances of any plan filed by Texaco before the January 11, 1988 deadline. Hence, by having timely filed its Joint Plan on December 31, 1987, Texaco's plan exclusivity continues until March 11, 1988.

■ The Icahn Group reasons that because Pennzoil joined with Texaco in proposing the plan that they negotiated, and because Texaco and Pennzoil agreed not to "vote for, consent to, support or participate in the forumulation of any other plan", it somehow follows that Texaco should be stripped of the plan exclusivity advantage authorized under 11 U.S.C. § 1121. Texaco and Pennzoil have done precisely what 11 U.S.C. § 1121 contemplated; namely the negotiation of a plan of reorganization that may be acceptable to creditors and other interested parties. Texaco and Pennzoil should not be faulted for agreeing to exert their best efforts to obtain confirmation of the plan that they negotiated. Indeed, the General Committee of Unsecured Creditors and the Equity Committee are in agreement with the Joint Plan and oppose the Icahn Group's efforts to propose an alternative plan consistent with the Icahn Group's concept of "corporate democracy". The Icahn Group can cite no case in support of its argument that Texaco has lost its plan exclusivity advantage by permitting Pennzoil to co-propose the Joint Plan. That is so because there are no cases which support this novel idea. The alternative to Texaco's plan exclusivity may come about only if the Joint Plan is rejected or if the Icahn Group can demonstrate cause for the court's reduction of the exclusivity period pursuant to 11 U.S.C. § 1121(d).

### Does Cause Exist For Permitting An Alternative Plan?

A debtor's exclusive right to file a plan of reorganization may be challenged under 11 U.S.C. § 1121(d) which provides as follows:

> (d) On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120–day period or the 180–day period referred to in this section.

A party in interest must establish cause for reducing or extending the exclusivity periods. In the instant case, the Icahn Group seeks to modify or terminate Texaco's exclusive right to file a plan so as to permit the Icahn Group to file an alternative plan for purposes of "corporate democracy". The proposed alternative plan would amend Texaco's Certificate of Incorporation and By–Laws so as to effect certain changes in corporate governance. There is no claim that any provision in Texaco's Certificate of Incorporation or in its By–Laws violates in any way the corporate laws of the State of Delaware, where Texaco was incorporated. The Texaco shares which the Icahn Group purchased are subject to the same rules and restrictions now as they were when they were purchased in November of 1987. The Joint Plan of Reorganization which Texaco filed last month does not propose to effect any changes in corporate governance.

The plan of reorganization which the Texaco debtors filed has the support of the General Committee of Unsecured Creditors, the Equity Committee and Pennzoil, which is Texaco's largest unsecured creditor. Pennzoil's right to receive full payment of its claim cannot be impaired without its consent. The Icahn Group's Alternative Plan also proposes to impair Pennzoil's claim by offering a $3 billion payment. However, Pennzoil objects to the proposed Alternative Plan and has actively moved to dismiss the Icahn Group's Complaint which seeks to nullify Pennzoil's stipulation to support Texaco's Plan of Reorganization. The General Committee of Unsecured Creditors contends that the changes in corporate governance proposed by the Icahn Group might jeopardize the value and rating of Texaco's long term debt and threatens to lead to a highly leveraged and far less secure financial condition for holders of long term debt. In such case, the holders of long term debt might regard their interests as impaired, so that their consent to the plan would be required. Additionally, the General Committee of Unsecured Creditors has indicated that they

might seek to file their own plan to protect $6 billion of long term creditors' claims. Hence, if Texaco's plan exclusivity periods were terminated, this could result an avalanche of plans from parties in interest which would undermine the prospects for a prompt resolution of Texaco's Chapter 11 cases.

Originally, two *ex officio* members of the Equity Committee, both of which were large institutional investors representing state pension plan trustees, filed affidavits in support of the Icahn Group's motion for leave to file an alternative plan of reorganization. These two institutional investors, namely the California Public Employees' Retirement System ("CALPERS"), the holder of approximately 760,000 shares of common stock of Texaco, and the Commonwealth of Pennsylvania Public School Employees' Retirment System ("PPSERS"), the beneficial owner of approximately 667,700 shares of the common stock of Texaco, appeared at the hearing held on January 20, 1988 and stated that they withdrew their support for the Icahn Group's motion and declared that they now support Texaco's Joint Plan of reorganization. This reversal in their positions stemmed from the fact that on January 19, 1988, the Equity Committee reached an agreement with Texaco which assured Texaco's support for certain corporate governance amendments to Texaco's Certificate of Incorporation to be submitted for a vote at the annual meeting of Texaco's shareholders, to be held in May of 1988. Texaco agreed to eliminate its "poison pill" takeover defense and to strengthen its "fair price" provisions of the By-Laws, which prevent some shareholders from getting less for their shares during a two-tier takeover attempt. Texaco also agreed to allow a proposal to be submitted to the shareholders to reduce the 80% supermajority requirement to 66⅔% majority. Texaco also approved an anti-greenmail provision barring Texaco from buying out a large shareholder at a price above the market.

The Equity Committee submitted a copy of the January 19, 1988 Stipulation and Agreement in evidence as Exhibit # 9. Additionally, the Equity Committee announced that as a result of the Stipulation and Agreement which was entered into only one day before the hearing regarding the Icahn Group's motion for leave to file an alternative plan, the Equity Committee has agreed to use its best efforts to obtain confirmation of Texaco's Joint Plan. Accordingly the Equity Committee opposes the Icahn Group's motion to modify Texaco's plan exclusivity in order to file an alternative plan.

At the hearing with respect to the issue of cause to terminate Texaco's plan exclusivity so as to allow the Icahn Group to file an alternative plan, the following facts emerged:

### Facts

1. Carl Icahn testified that he strongly favored the principle that corporate shareholders should have the right to hold management accountable. He believed that he could use the provisions of the Bankruptcy Code to change Texaco's corporate goverance provisions which he found to be offensive and contrary to the interests of shareholders.

2. As the largest single Texaco shareholder, Carl Icahn said he would vote against Texaco's Joint Plan because he opposes Texaco's corporate governance provisions which are devices for management's entrenchment. However, he stated that he does not seek control of Texaco or any representation on its Board of Directors.

3. Following his acquisition of Texaco stock, Icahn met with various entities which expressed an intention of purchasing Texaco's property. Thus, he met with representatives of Occidental Petroleum Company with regard to the sale of Texaco Canada. He also met with representatives of Husky Oil Company and various investment bankers.

4. The movants' expert witness, Robert A. Monks, the president of Institutional Shareholder Services, Inc. and a former trustee of the Federal Employees Retirement System ("FERS") testified that institutional investors favored shareholder

rights and opposed anti-takeover measures adopted by corporate managements.

5. Similarly, Professor James E. Walter of the University of Pennsylvania's Wharton Business School testified that the elimination of the so-called management entrenchment devices in Texaco's Certificate of Incorporation and By–Laws would have a positive impact on the short run and long run value of Texaco's stock.

6. Texaco's expert, Eric Gleacher, the head of mergers and acquisitions for Morgan Stanley & Company, disagreed with the Ichan Group's experts and testified that the anti-takeover devices adopted by many large corporations did not have an adverse affect on the economic interests of shareholders. Indeed, the use of anti-takeover devices did not slow down takeover activities which increased in dollar volume since 1983.

7. In response to the concessions that the Equity Committee obtained from Texaco pursuant to the Stipulation dated January 19, 1988, the Chairman of the Equity Committee, Robert Norris, testified that the Equity Committee did not get all that it requested, but that it obtained the best it could get. It was an acceptable compromise following negotiations between the Equity Committee and Texaco.

8. It is clear from the testimony regarding corporate governance that the questions, (1) whether or not the elimination of anti-takeover devices is more beneficial to stockholders; and (2) whether or not stockholders should have greater voting rights to oust elected boards of directors, in order to attain greater accountability from management, are issues which are not addressed in the Bankruptcy Code in the context of determining if cause exists within the meaning of 11 U.S.C. § 1121(d) to terminate or modify a debtor's exclusive right to file a plan of reorganization.

9. There was no proof that any provision in Texaco's Certificate of Incorporation or in its By–Laws violated any of the corporate laws of the State of Delaware, where Texaco was incorporated.

10. The Icahn Group has failed to sustain its burden of establishing cause, for terminating or modifying Texaco's exclusive right to formulate and file a plan of reorganization.

### DISCUSSION

Section 1121(d) of the Bankruptcy Code does not define precisely what factors should be established to constitute "cause" for an extension or a reduction of the exclusivity periods afforded a debtor with respect to formulating and filing a plan of reorganization. This court previously pointed out in *In re Texaco*, 76 B.R. 322 (Bankr.S.D.N.Y.1987) that in those cases where the exclusivity periods were reduced, factors such as gross mismanagement of the debtor's operations, as in *In re Crescent Beach Inn, Inc.*, 22 B.R. 155 (Bankr.D.Me.1982), or acrimonious feuding between the debtor's principals, as in *Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.)*, 68 B.R. 712, 725 (N.D.Tex.1986), were major obstacles to a successful reorganization and were regarded as "cause" for the reduction of the exclusivity periods. Similarly, the legislative history accompanying 11 U.S.C. § 1121 indicates that the plan exclusivity provisions should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory. In the instant case, Pennzoil, as the largest unsecured creditor, and the statutory committees of unsecured creditors and shareholders, as well as the two *ex officio* members of the Equity Committee who are large institutional investors for state pension funds have announced that they find the Texaco Joint Plan satisfactory and worthy of their support.

There is no evidence that Texaco is using the plan exclusivity period as a tactical device to put pressure on the Icahn Group to yield to the proposed Texaco Joint Plan. Indeed, the Icahn Group supports the basic provisions of the Texaco–Pennzoil settlement but would like to include additional provisions with respect to corporate governance which they state are in furtherance of the concepts of corporate democracy, shareholder rights and management accountability. However, the Icahn Group

has pointed to no feature in Texaco's Joint Plan which offends any of the requirements that must be contained in a plan of reorganization, as set forth in 11 U.S.C. § 1123, which would constitute cause for terminating Texaco's plan exclusivity rights under 11 U.S.C. § 1121(d).

The Chapter 11 Reorganization process is not the appropriate vehicle for introducing changes in Texaco's existing system of corporate governance. The changes proposed by the Icahn Group should be dealt with in an appropriate state law forum, rather than in Bankruptcy Court. The Icahn Group's reliance on *In re Acequia, Inc.*, 787 F.2d 1352 (9th Cir.1986) is misplaced. The *Acequia* court held that if a plan of reorganization calls for the issuance of new stock there must be a provision calling for an amendment of the corporate debtor's certificate of incorporation which prohibits the issuance of nonvoting equity securities, as required under 11 U.S.C. § 1123(a)(6). The Texaco Joint Plan satisfies 11 U.S.C. § 1123(a)(6) and does not provide for the issuance of any nonvoting securities. Additionally, the *Acequia* court ruled that any plan which alters voting rights or establishes management in connection with a plan of reorganization must be scrutinized carefully in accordance with the requirements of 11 U.S.C. § 1123(a)(6) and (7). The Texaco Joint Plan does not alter voting rights or take any position with respect to Texaco's management or its Board of Directors. There is nothing in Texaco's Joint Plan which would offend any of the requirements under 11 U.S.C. § 1123(a)(6) or (7). Nor is there any provision in Texaco's Joint Plan which the Icahn Group has shown to be in violation of Delaware corporate law.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the persons in this case in accordance with 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

2. The Texaco debtors continue to possess the exclusive right to file a plan of

arrangement in their Chapter 11 cases as permitted under 11 U.S.C. § 1121(b).

3. The Icahn Group has not sustained their burden of establishing cause within the meaning of 11 U.S.C. § 1121(d) for modifying or terminating Texaco's exclusive right to proceed with its plan of reorganization.

4. The Icahn Group's motion for leave to file an Alternative Plan of Reorganization in these Chapter 11 cases is denied.

SETTLE ORDER on notice.