In re EAGLE–PICHER INDUSTRIES, INC., et al., Debtors.

OFFICIAL UNSECURED CREDITORS' COMMITTEE, Movant,

v.

EAGLE–PICHER INDUSTRIES, INC., et al., Respondents.

OFFICIAL EQUITY SECURITY HOLDERS' COMMITTEE, Movant,

v.

EAGLE–PICHER INDUSTRIES, INC., et al., Respondents.

Bankruptcy No. 1–91–00100.

United States Bankruptcy Court, S.D. Ohio, Western Division.

July 27, 1994.

See also, 167 B.R. 102.

Stephen Karotkin, Weil, Gotshal & Manges, New York City, for Eagle–Picher Indus., Inc.

G. Christopher Meyer, Squire, Sanders & Dempsey, Cleveland, OH, for Unsecured Creditors' Committee.

Claude D. Montgomery, Marcus Montgomery Wolfson & Burten, New York City, for Equity Security Holders' Committee.

### DECISION and ORDER ON (1) MOTION TO TERMINATE EXCLUSIVITY PERIOD and (2) MOTION TO DECLARE MEDIATION IMPASSE

BURTON PERLMAN, Bankruptcy Judge.

In these consolidated Chapter 11 bankruptcy cases, two official committees have

filed motions which are now before the court for decision. The Official Unsecured Creditors' Committee ("UCC") has moved "For Order Terminating or Modifying Exclusivity Period to Permit Filing of Alternative Reorganization Plan." The Official Equity Security Holders' Committee ("Equity Committee") has filed motion "To Declare Mediation Impasse." The reason that the Equity Committee urges the declaration of an impasse is because, in accordance with the terms of the mediation which has been underway in the bankruptcy cases for some time, the exclusivity period will terminate 60 days after the declaration of impasse. The Equity Committee then could file an alternative plan. The objective of the Equity Committee is thus the same as that of the UCC and the two motions are related in substance. They were addressed at the same hearing before the court.

■ A mediator was appointed by order dated June 9, 1992, for the purpose of lending assistance to the several constituencies in their efforts to develop a consensual Chapter 11 plan. There had been substantial proceedings since the consolidated cases were filed January 7, 1991, and prior to that appointment. At the hearing on the present motions, counsel for the UCC reviewed the history of the mediation effort for the purpose of making the point that the UCC, while initially involved for most of the period of mediation, was excluded from the discussions which were occurring. In our view, the prior history has a bearing on a correct decision on the questions before us, but that review ought to begin with events prior to those addressed by the UCC. What appears hereafter is derived almost entirely from correspondence of which all constituencies have copies.

There came on for hearing, beginning on April 8, 1992, a matter in which the consolidated debtors were on one side, pitted against the Official Injury Claimants' Committee ("ICC") and the Future Claims Representative ("FCR") on the other side. The issue was whether additional information was necessary before a valuation of total asbestos claims could reasonably be made, or whether sufficient information was already in hand for that purpose. Debtors espoused the former position; the ICC and the FCR the latter. The hearing was intense and hard fought, with both parties presenting significant expert and other testimony.

At the conclusion of the hearing, counsel for the UCC rose and suggested to the court that decision on the subject of the hearing be deferred while the parties attempted to negotiate a settlement of their differences. Notwithstanding the very strong positions theretofore expressed by the contenders, all of the official constituencies acquiesced in the suggestion of counsel for the UCC. Because of the regard which the court had come to hold for that counsel by reason of her professionalism in the cases to that time, we asked her to serve as the convener of the discussions. We asked further that we receive a report biweekly on the discussions.

The reports which were thereafter provided indicated that discussions were proceeding not only on a common ground for resolving the issue which had been heard by the court, but also on discussions about possible plan structures. We were informed that the hearing contenders were "deeply divided" on the question of who would ultimately control the debtors after reorganization. Counsel indicated that there had to be "some ideas that can bridge this divide" before there could be real steps toward a consensual plan. Further meetings of the parties ensued.[1] While there were substantial discussions through April and May, 1992, by the beginning of June we were informed by counsel that interest in the discussions being held had waned because the parties were expecting that a mediator would be appointed. Shortly thereafter, an order appointing Jerry Lawson as mediator was entered, the selection of the mediator having been acquiesced in by all interested parties. A condition of the mediation was that discussions between the several parties were to be confidential and not disclosed to the court.

---

1. At at least one meeting of constituencies, the representative of the Equity Committee was asked to leave the discussion—a precedent akin to the procedure of the mediator.

It was the purpose of the court in installing the mediator to ascertain expediently whether no agreement was possible so that, if that were the case, we could get on with the business of deciding the matter relating to additional information which was before us. Instead, the mediator, rather to our surprise, expressed optimism about a positive outcome. There then followed an extended period of mediation. While the court would have preferred a speedier resolution, we were ultimately gratified that the debtors and the ICC and the FCR, through the efforts of the mediator, had been able to "bridge the divide" which had separated them. In achieving this result, it was the judgment of the mediator that the soundest way to approach what was before him was to involve himself in the first instance with the debtors, the ICC and the FCR, the active parties in sharpest disagreement. While the mediator did involve the UCC and the Equity Committee in discussions for some months at the beginning of the mediation, that did not continue.

The outcome of the mediation effort was that the debtors, the ICC and the FCR reached agreement on a "term sheet" which would provide the basis for a consensual plan. Debtors thereupon issued a press release announcing this agreement. In the press release, it was noted that there would now be negotiation with the UCC and the Equity Committee, but if those negotiations were unsuccessful, the plan to be proposed would provide for a 30% distribution to unsecured creditors with nothing for equity. We are informed that thereafter debtors opened discussions with the UCC and offered the UCC a 30% distribution. The UCC responded with a counterproposal, the contents of which, consistent with the requirement of the mediation order that the court not be informed of proceedings before the mediator, have not been disclosed to the court. There have been no further discussions between these parties.

By letter dated May 2, 1994 to counsel for the UCC, the mediator stated that: "I plan to let Judge Perlman know that at least for the time being negotiations are at an impasse. He may want to hold open the possibility of further mediation at a future time if prospects for an agreement improve." By letter dated May 16, 1994, the mediator informed counsel for the several constituencies that "I do not believe that further progress can be made at this time to develop a consensual plan which has the support of the Unsecured Creditors and the Equity Committees. I further advised him [the court] that after a plan is filed by EPI, the ICC, and the Future Representative, negotiation may resume and that I will be available to mediate those negotiations." The mediator then by letter dated May 19, 1994, to counsel for the several constituencies said: "To clarify, it was not my intention to declare an impasse in this case either with my May 2, 1994 or May 16, 1994 letters and you should not consider those letters as declaring an impasse."

It is against this background that the UCC moves for termination of the exclusivity period in order that it may file a an alternative plan in these cases. In its filing in support of its motion, it is the position of the UCC that it has not been dealt with fairly because it was excluded from the mediation for most of the time, and a plan was developed with no opportunity for it to have input. Therefore, the UCC says, in fairness it should be given an opportunity to propose its own plan. This will level the playing field, and a level playing field is contemplated by the Bankruptcy Code, says the UCC.

The Bankruptcy Code at 11 U.S.C. § 1121(b) provides that "Only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter." The Code in that section at (d) further provides that on request of a party such as the UCC "the court may for cause reduce or increase the 120–day period." In the present case, the 120–day period since the filing of the cases has long since passed, but the court has upon timely motion extended that period, and pursuant to our mediation order, exclusivity is to continue at least until 60 days after impasse is declared. Notwithstanding these prior orders of the court, the present motion of the UCC is entirely consistent with § 1121(d), and there is no bar to the UCC bringing the present motion.

■ In order to succeed on the motion, however, the statute requires that cause be shown. A pertinent cause might be delay by the debtor. H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977). Further, an "extension should not be employed as a tactical device to put pressure on parties in interest who yield to a plan they consider unsatisfactory." S.Rep. No. 989, 95th Cong., 2d Sess. 118 (1978). Additionally, light is shed on the discussion by the following from *In re Texaco, Inc.*, 81 B.R. 806 (Bankr.S.D.N.Y.1988) at p. 812:

> Section 1121(d) of the Bankruptcy Code does not define precisely what factors should be established to constitute "cause" for an extension or a reduction of the exclusivity periods afforded a debtor with respect to formulating and filing a plan of reorganization. This court previously pointed out in *In re Texaco*, 76 B.R. 322 (Bankr.S.D.N.Y.1987) that in those cases where the exclusivity periods were reduced, factors such as gross mismanagement of the debtor's operations, as in *In re Crescent Beach Inn, Inc.*, 22 B.R. 155 (Bankr.D.Me.1982), or acrimonious feuding between the debtor's principals, as in *Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.)*, 68 B.R. 712, 725 (N.D.Tex.1986), were major obstacles to a successful reorganization and were regarded as "cause" for the reduction of the exclusivity periods. Similarly, the legislative history accompanying 11 U.S.C. § 1121 indicates that the plan exclusivity provisions should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory.

Interestingly, in *Texaco* the Icahn group, the party seeking to terminate exclusivity so that it might file an alternative plan, fully disclosed the purpose and content of the plan which it wanted to file. There has been no comparable disclosure by the UCC in the matter now before this court.

■ Where the only grounds suggested by a movant for termination of the exclusivity period in order that it may file an alternative plan, are, first, that it has been treated unfairly because it has been excluded from negotiations being conducted under the aegis of a mediator, and, second, that the filing of a competing plan will expedite the prompt resolution of these bankruptcy cases, this court is unable to find the cause required by § 1121(d). This court does not believe that the UCC has been treated unfairly because it has not been allowed to participate throughout in the negotiations conducted by the mediator. The procedure followed by the mediator has been entirely sound and sensible, for the central issue to be overcome, if it could be overcome, was that between debtors and the ICC and the FCR. It was in the interest of everyone, once there was agreement by all parties that negotiations might be useful, to find out whether that divide could be bridged. Those parties have found a way to do so. There is no reason to believe, however, that participation in those discussions by additional parties, where there was a third party mediator already involved, could have helped to expedite the process. Promptly after reaching a successful conclusion to their discussions, the debtors approached the UCC. That their discussions were not fruitful does not lead this court to any conclusion that there was unfairness in the process. There is no evidence that there has been undue delay. The UCC has presented no evidence which might show that continuation of the exclusivity period is being employed as a tactical device to put pressure on the UCC or the Equity Committee to yield to a plan that they consider unsatisfactory.

■ As to the remaining consideration, that the presentation of a competing plan or plans will serve to expedite a prompt resolution of these cases, this court is left entirely unpersuaded on this score. Perhaps it is because this consideration must entirely be a judgment call, no evidence was presented in its support. All that was presented were expressions of counsel of matters of experience, on the one hand, that in the *Hunt* cases, competing plans had assisted an early resolution, while, on the other hand, reference was made to *Public Service of New Hampshire*, where a competing plan was said to have led only to a proliferation of litigation which had led to great expense and had impeded an early resolution. As a matter of

148

judgment and experience, we share the view of the court in *Texaco* which stated that if debtor's exclusivity period were terminated, the filing of competing plans "would undermine the prospects for a prompt resolution of Texaco's Chapter 11 cases." 81 B.R. at 811.

The view of the UCC that it should in fairness be allowed to file an alternative plan because it is entitled to a level playing field does not lead us to alter our view that the UCC has failed to show cause for termination of the exclusivity period. The UCC argued that a level playing field was what was contemplated by the Bankruptcy Code. That is simply not so. The concept of an exclusivity period in favor of a debtor, a consideration at the heart of the Bankruptcy Code, on its face contradicts the notion that parties in a Chapter 11 bankruptcy case be given an equal opportunity to seek confirmation of a plan. What will happen now in these consolidated cases is that they will proceed in the manner contemplated by the Bankruptcy Code. That is, debtors under the shield of exclusivity will present their plan. Other constituencies, all in these cases represented by knowledgeable and competent counsel, can then take such steps in the pursuit of the interests of their constituencies as are appropriate. If debtors' plan fails of confirmation, then it may be appropriate for these constituencies to present their own plan or plans.

The motion of the Equity Committee, though different in form from that of the UCC in that it seeks a declaration of impasse in the mediation process, has the same ultimate objective as does the motion of the UCC. This is so because a declaration of impasse will begin the running of a 60–day period to the end of exclusivity, whereupon the Equity Committee would be in a position then to file a competing plan. Our foregoing remarks regarding the motion of the UCC, therefore, are equally applicable to the motion of the Equity Committee.

At the hearing, counsel for the Equity Committee offered the additional consideration in support of the motion of his Committee that we ought to import into these bankruptcy cases concepts of impasse from the field of labor law. We hold the suggestion to be unsound. As a general proposition, labor law doctrines are not readily transferrable to the field of bankruptcy. The fact that Congress found it necessary to enact 11 U.S.C. § 1113, which explicitly addresses the process of collective bargaining in a bankruptcy context, is testimony to that. The following remarks by this court in an unreported decision, *In re Valley Kitchens, Inc.*, 58 B.R. 6 (Bankr.S.D.Ohio 1985), are pertinent:

> The Union argues that the bankruptcy court has no discretion to hear the issues of "procedural arbitrability", thereby separating them from the possible decision by an arbitrator on the substantive issues. It contends that once it is determined that an arbitration clause applies to a particular dispute and that the substantive issues are to be decided by an arbitrator, issues concerning whether proper procedure for invoking arbitration were followed should also be determined by an arbitrator, not the court. In support of this position, Union cites *John Wiley and Sons, Inc. v. Livingston*, 376 U.S. 543 [84 S.Ct. 909, 11 L.Ed.2d 898] (1964), as well as its numerous progeny. The Union contends that such cases require this court to allow both the procedural issues and the substantive issues of the grievances to proceed to arbitration. The foregoing cases are, however, distinguishable for they did not involve companies in bankruptcy. *When a company files bankruptcy, an added dimension appears that has to do with the rights of other creditors of debtor and the public interest in debtor's rehabilitation. These considerations do not enter into the cases upon which the Union relies, and lead us to a different result here.*

(emphasis added.)

In the present bankruptcy cases, all of the constituencies acquiesced both in the initiation of mediation, and the selection of the mediator. The mediator has expressed the view that impasse has not occurred. He contemplates further mediation efforts following the filing of debtors' plan. This court sees no reason to question the judgment of the mediator on this score.

In light of the foregoing discussion, the respective motions of the UCC and the Equity Committee are denied.

So ordered.