## In re SITUATION MANAGEMENT SYSTEMS, INC. Debtor

### No. 97–20394–JNF.

United States Bankruptcy Court, D. Massachusetts.

June 20, 2000.

James M. Liston, Barlett, Hackett & Feinberger P.C., Boston, MA, for Debtor.

Francis A. Shannon, III, Boston, MA, for Committee of Unsecured Creditors.

Paula R.C. Bachtell, Boston, MA, for United States Trustee.

### MEMORÁNDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court is the Motion of the Official Committee of Unsecured Creditors' (the "Committee") to Waive the Exclusivity Period of Situation Management Systems ("SMS" or the "Debtor"), pursuant to 11 U.S.C. § 1121(d). Through its motion, the Com-

mittee requests that the Court terminate the exclusivity period so that competing plans can be filed. The Committee asserts that: 1) the Debtor's plan improperly classifies claims in violation of 11 U.S.C. § 1122(a) and (b); 2) the Debtor unreasonably delayed filing its plan; and 3) the Debtor used the exclusivity period as a tactical device to force creditors to accept an unsatisfactory plan.

In its Opposition, the Debtor maintains that the plan complies with the requirements of 11 U.S.C. § 1123 and denies that it delayed filing its plan. In support, the Debtor argues that the Committee assented to the numerous extensions of the exclusivity period and that the Debtor filed its plan within the extended deadline.

LMA, Inc., ("LMA"), the Debtor's largest creditor, filed a Memorandum in Support of Creditors Committee's Motion to Reduce Exclusivity Period on May 15, 2000 asserting that the Debtor's plan is not confirmable. It further asserts that the Plan was not filed in good faith, as the Debtor has significant income and substantial assets, yet the Plan provides for the Debtor to retain those assets with a minimal contribution of new value.

On May 23, 2000, the Court held a hearing on the Committee's motion, the Debtor's objection to the motion, and LMA's memorandum in support of the motion. Following the hearing, the Court took the matter under advisement.

The issue before the Court is whether the exclusivity period should be terminated to allow the Committee and the Debtor's largest creditor, to file a competing plan where the Debtor has filed a "new value" plan containing a provision for sale of the equity interest and where the Debtor's largest creditor represents it intends to make an offer for the Debtor's equity interest. The facts necessary to resolve the matter are not in dispute. The Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## II. PROCEDURAL BACKGROUND

The Debtor filed a voluntary petition under Chapter 11 on October 21, 1997. The Debtor filed Schedules A—H and its Statement of Financial Affairs on December 2, 1997. On Schedule F–Creditors Holding Unsecured Non–Priority Claims, the Debtor listed LMA as the holder of a claim in the amount of $5,978,732. In 1993, the Debtor sued LMA, which is owned by the Debtor's former employee LeRoy Malouf, after the 17–year business relationship between the two companies ended. LMA filed a counterclaim for breach of contract. The Plymouth County Superior Court entered judgment in favor of LMA and awarded damages of $3,800,000 on its counterclaim. The Massachusetts Supreme Judicial Court (the "SJC") granted the Debtor's application for direct appellate review. On March 8, 2000 the SJC affirmed LMA's judgment against the Debtor. LMA's claim for $5,978,732 represents the $3,800,000 in principal plus accrued interest from the date of the Plymouth County Superior Court judgment.

On January 26, 1998 the Debtor filed a motion requesting an extension of the exclusivity period and relief from the automatic stay to proceed with its appeal against LMA. The Court granted relief from the automatic stay on February 11, 1998 and on February 24, 1998 extended the exclusivity period as no objections were filed. On July 31, 1998 the Debtor moved for a second extension of the exclusivity period. No objections to the motion were filed, and on August 4, 1999, the Court extended the deadline to March 1, 1999. The Debtor requested a third extension of the exclusivity period on February 2, 1999 and LMA filed an objection. At a hearing on February 26, 1999, LMA withdrew its objection and the Court ex-

tended the deadline for filing a plan until November 1, 1999. On September 30, 1999 the Debtor filed a fourth motion to extend the exclusivity period. No objections were filed and the Court granted the motion on October 13, 1999. On February 4, 2000 the Debtor filed a motion to extend the exclusivity period for a fifth time. No objections were filed. On February 16th, the exclusive period for filing a plan was again extended to May 1, 2000 and the corresponding exclusive period for obtaining acceptance of the plan was extended to June 30, 2000.

During the exclusive period for filing a plan, the SJC affirmed LMA's judgment against the Debtor on March 8, 2000. On April 28, 2000, prior to the expiration of the extended exclusivity period, the Debtor filed its Plan of Reorganization and Disclosure Statement. The Committee filed the Motion to Waive Exclusivity Period on May 3, 2000. Subsequently, the Debtor filed its First Amended Plan of Reorganization of Situation Management Systems, Inc., (the "Plan") on June 7, 2000.

## III. THE PLAN[1]

The First Amended Plan of Reorganization of Situation Management Systems Inc., (the "Plan") invokes the "new value" corollary to the absolute priority rule. The Debtor proposes that a prepetition equity holder purchase 100% of the shares ("Plan Shares") in the reorganized Debtor. The Debtor's President, Treasurer, Clerk,

Director and 50% shareholder, Alexander B. Moore (the "Initial Offeror"), offered $100,000.00 cash for the Plan Shares. Through the Plan, the Debtor invites other parties to bid on the Plan Shares, but subsequent bids must be at least 5% higher than the Initial Offeror's bid. All qualified bidders have the opportunity to make one additional sealed bid to the Court at the confirmation hearing. Court approval of the highest bid shall determine the purchase price for the Plan Shares. The purchaser will receive 100% of the new common stock in SMS.

There are five separate classes of claims under the Debtor's Plan. Class 1 contains all allowed secured claims. The Debtor proposes to pay these claims in full. Class 2 is an administrative convenience class under 11 U.S.C. § 1122(b)[2] and contains unsecured claims aggregating $1,000 or less. Creditors whose allowed unsecured claims aggregate more than $1,000 may elect to reduce them to $1,000 before the confirmation date. The Debtor proposes to pay Class 2 claims a 40% dividend. The Debtor's Plan creates a separate class for contract trainers. All of the Debtor's contract trainers' non-priority allowed unsecured claims are grouped together in Class 3 and the Plan provides for full payment of these claims.

Class 4 contains all allowed unsecured claims not contained in Class 2 or Class 3. The Debtor allocates 75% of the purchase price for the Plan Shares to the pro-rata payment of Class 4 claims on the effective

---

1. The Plan discussed in Section III of this Memorandum is the First Amended Plan of Reorganization, filed on June 7, 2000. The Plan of Reorganization, discussed in Section IV, is the original plan filed on April 28, 2000. The pertinent provisions of the plan which are at issue in this Memorandum are the same.

2. Section 1122, Classification of claims or interests, provides in pertinent part:
   (a) Except as provided in subsection (b) of this section, a plan may place a claim or an

interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.
11 U.S.C. § 1122.

date.[3] These claims will be paid pro-rata over a 48 month period in an amount "not less than approximately 13%."

Class 5 contains all of the present SMS shareholders. These claimants do not receive a distribution under the plan. Class 5 is deemed not to have accepted the plan pursuant to 11 U.S.C. § 1126(g).[4]

## IV. POSITIONS OF THE PARTIES

### A. The Committee and LMA

The Committee and LMA argue that the Debtor's exclusivity period should be terminated because the Plan of Reorganization is unconfirmable. Together the Committee and LMA allege that the Debtor improperly classified unsecured claims in an attempt to gerrymander classes for confirmation under the cramdown method. Both parties argue that Class 2, an administrative convenience class containing unsecured claims aggregating $1,000 or less, is neither reasonable nor necessary as required in 11 U.S.C. § 1122(b). The Committee and LMA also contend that claims of the contract trainer and employees for unpaid wages cannot be separated from other unsecured claims. In support, the Committee and LMA argue that recently enacted wage protection laws do not

require the Debtor to pay these claims in full. See M.G.L. c. 149 §§ 27A–H, 148.[5]

The Committee additionally asserts that the Debtor delayed filing its Plan and that the Debtor used the exclusivity period as a tactical device to force creditors to accept the Plan. LMA maintains that the Debtor's Plan is not in the best interest of creditors because it proposes to pay the approximate 13% dividend to unsecured creditors while the Committee has proposed a feasible plan that would pay unsecured claims in full. In addition, LMA maintains that the Plan permits insiders to credit bid their claims while making no provision for others to do the same.

### B. The Debtor

In its opposition to the motion, the Debtor denies any improper classification of unsecured claims. Although claims in Class 3 are paid in full under the Plan, the Debtor argues that if these claims are not paid in full, SMS may be criminally liable to the claimants, as well as civilly liable for treble damages and attorney's fees under recently enacted wage protection laws. See M.G.L. c. 149 §§ 148, 27A–H. Thus, it argues that its potential liability to Class 3 claimants justifies separate classification. The Debtor also submits that the Plan

---

3. The Debtor will retain the remaining 25% of the purchase price as working capital.

4. Section 1126, Acceptance of plan, provides in pertinent part:
   (g) Notwithstanding any other provisions of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.
   11 U.S.C. § 1126(g).

5. Mass. Gen. Laws c. 149 § 148 provides for the payment of wages by every person having employees in his service and imposes severe penalties on employers who violate the statute. Any employer who "willfully" violates the section will be punished by a fine of not

more than $25,000 or by imprisonment for not more than one year. Any employer who violates the statute "without a willful intent to do so" will be punished by a fine of not more than $10,000 or by imprisonment for not more than 6 months.

Mass. Gen. Laws. ch. 149 § 148; Mass. Gen. Laws. ch. 149 § 27C (West, 2000).
   Mass. Gen. Laws. c. 149 § 27A–H provides that any employee aggrieved by a violation of the statute may institute and prosecute a civil action for injunctive relief and damages incurred, including treble damages for any loss of wages and benefits. Any employee who prevails in such an action shall further be entitled to an award of the costs of litigation and attorneys' fees.
Mass. Gen. Laws. c. 149 § 27A–H.

correctly classifies unsecured claims aggregating $1,000 or less in an administrative convenience class in accordance with 11 U.S.C. § 1122(b).

In response to the Committee's allegations that it delayed filing its Plan and abused its exclusive right to file a plan, the Debtor points out that the Committee did not object to any extension of the exclusivity period. The Debtor argues that the extensions of the exclusivity period were necessary and proper because the structure of the Plan depended upon the outcome of the Debtor's appeal against LMA. Further, the Debtor alleges that LMA improperly solicited a plan while the Debtor held the exclusive right to file a plan of reorganization.

## V. DISCUSSION

### A. Applicable Law

The Committee moved to terminate the Debtor's exclusivity period pursuant to 11 U.S.C. § 1121(d).[6] The Code does not define "cause" for reducing the exclusivity period. Courts have specified the following factors for determining whether to terminate the exclusivity period: 1) the debtor's use of exclusivity period to force creditors to accept an unsatisfactory or

unconfirmable plan, *In re Texaco, Inc.*, 81 B.R. 806, 812–813 (Bankr.S.D.N.Y.1988); *In re Standard Mill Limited Partnership*, 1996 WL 521190 (Bankr.D.Minn.1996); 2) the debtor's delay in filing a plan, *In re Eagle–Picher Industries, Inc.*, 176 B.R. 143, 147 (Bankr.S.D.Ohio 1994); 3) gross mismanagement of the debtor's operations, *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 159 (Bankr.D.Me.1982); and 4) "acrimonious relations" between the debtor's principals, *Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.)*, 68 B.R. 712, 725 (N.D.Tex.1986).

The threshold issue presented in this case is whether a "new value" provision in a reorganization plan constitutes cause for terminating the exclusivity period. In *Bank of America Nat'l Trust and Savings Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 441–443, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), the United States Supreme Court ruled that a plan providing for equity holders to contribute new capital was not confirmable in the absence of competitive bidding for the equity interests to determine the adequacy of the new value contribution. *Id.* at 457–58, 119 S.Ct. 1411.[7] Although it held that the debtor's plan was doomed without an op-

---

6. Section 1121 provides:

(a) The debtor may file a plan with a petition commencing a voluntary case, or at any time in a voluntary case or an involuntary case.

(b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

(c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if-

(1) a trustee has been appointed under this chapter;

(2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3) the debtor has not filed a plan that has been accepted, before 180 days after

the date of the order for relief under this chapter, by each class of claims or interests that is impaired under the plan.

(d) On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120–day period or the 180–day period referred to in this section....

11 U.S.C. § 1121.

7. Prior to *203 North LaSalle*, Judge Queenan ruled in *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1010–11 (Bankr.D.Mass.1991), that a provision in a reorganization plan for a new value necessitated the sale of the equity interest at auction, with the winning bidder consummating the plan. The court did not discuss whether the exclusivity period should be terminated in light of the filing of a new value plan.

portunity to compete or offer a competing plan, the Court did not provide a procedural method for valuing the equity interests in the reorganized debtor: "whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity is a question we do not decide here." *203 North LaSalle Street Partnership*, 526 U.S. at 458, 119 S.Ct. 1411.

Prior to *203 North LaSalle*, there existed a split of authority on the issue of whether the debtor's exclusive right to file a plan under 11 U.S.C. § 1121 should terminate when a debtor proposes a "new value" plan. *See In re Moonraker Associates, Ltd.*, 200 B.R. 950, 954–55 (Bankr.N.D.Ga.1996)(denying termination and extending exclusivity reasoning that competitive bidding that could develop through the filing of competing plans would "not necessarily" enhance new value or appropriately reflect a creditor's bargaining strength and could upset the balance of bargaining leverage created by Congress); *Matter of Homestead Partners, Ltd.*, 197 B.R. 706, 716–17 (Bankr.N.D.Ga.1996)(although terminating exclusivity and allowing creditors to file competing plans is one method to fulfill the new value corollary's competitive bidding requirement, an equity auction at the point of confirmation fostered a more favorable competitive bidding environment than terminating the debtor's exclusivity because it did not disrupt the plan negotiating process.) The Court in *In re SM 104, Ltd.*, 160 B.R. 202, 225 (Bankr.S.D.Fla.1993), adopted a contrary view, suggesting that exclusivity should be terminated where the bidding process has been initiated by the filing of a plan calling for a new value

contribution. The court observed that competing plans provide a better method for valuation of reorganized equity interests when new value plans are proposed because the Code's disclosure requirements generate informed competing bids for the new equity. *Id.* at 225–27.[8]

Commentators agree that filing a new value plan is sufficient cause to terminate the debtor's exclusive right to file a plan under 11 U.S.C. § 1121(d).

> Automatic termination of exclusivity whenever owners propose a new value plan would equalize the parties' bargaining positions. If creditors can file a competing plan without incurring the cost of fighting exclusivity, they no longer need to deduct such cost from their bid to achieve their desired profit. Termination of exclusivity can thereby provide a potent check on owners' latitude with respect to the initial setting of reorganization value and plan structure. If creditors disagree with the amount of value allocated to them under the plan, they may automatically propose their own plan, thus neutralizing owners use of their control of the debtor.

Markell, Bruce A. *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 Stan. L.Rev. 69, 118–119 (1991), citations omitted. *Accord*, Bowles, C.R. *The Sale of the Century or a Fraud on Creditors?: The Fiduciary Duty of Trustees and Debtors in Possession Relating to the "Sale" of a Debtor's Assets in Bankruptcy*, 28 U. Mem. L.Rev. 781, 844–845 (1998). Indeed, the National Bankruptcy Review Commission ("NBRC") proposed an amendment providing for termination of the exclusivity period when a Chapter 11 debtor files a "new value"

---

8. The court denied confirmation of the debtor's new value plan for the following reasons: the plan was not fair and equitable to the debtor's largest secured creditor because it did not pay the creditor an adequate interest rate on its claim; the debtor failed to show that the plan was feasible; and the plan violated 11 U.S.C. § 1129(a)(5). *In re SM 104 Ltd.*, 160 B.R. at 245.

plan:[9]

Section 1121 should be amended to provide that on the request of a party in interest, the court will terminate exclusivity if a Debtor moves to confirm a non-consensual plan that provides for the participation of a holder of a junior claim or interest under [section] 1129(b)(2)(B) but does not satisfy the condition set forth in section 1129(b)(2)(B)(i).

Commenting on the proper method to assess the market value of the reorganized Debtor's equity interests, the NBRC stated:

the Commission also recommends a significant additional condition: exclusivity should be lifted as of right whenever a debtor seeks to confirm a cramdown plan under section 1129(b)(2)(B)(ii) that uses equity contributions from former equity holders in its financing .... The best way to accomplish this marketplace validation of value is to permit other parties to propose plans of reorganization that may garner creditor support to compete when the debtor moves for confirmation of an unsecured creditor cramdown plan .... The notion that a termination of exclusivity might accompany a debtor's move to cram down a plan is not completely foreign. Courts already are permitted to shorten the exclusivity periods for cause and even in the absence of a specific provision, several courts have suggested that the proposal of a new value plan might constitute such cause. A mandatory exclusivity termination provision will substantially restrict a debtor's opportunity to shield itself from creditors who place different valuations on the reorganized business.

Nat'l Bankr.Rev. Comm'n, Bankruptcy: The Next Twenty Years § 2.4.15, at 24 (1997).

Applying these principles to the present case, the Court finds that there is cause to terminate the Debtor's exclusivity period to gain acceptance of its plan. The provisions for competitive bidding in the Debtor's proposed plan warrant termination of exclusivity for a number of reasons.

First, LMA has represented that it intends to bid on the Debtor's equity interests whether in the context of the equity auction or by alternatively joining with the Committee in the filing of a competing plan. The new value provision in the Debtor's plan, which provides for the sale of the stock in the reorganized Debtor, exposes the Debtor's equity interests to competitive bidding; no longer is the control of equity interests protected. Thus, as a practical matter, the Debtor's exclusive right to propose and gain acceptance of a plan has effectively been forfeited because any party can bid on the Debtor's equity interest and assume control of the Debtor if the bidder is successful.

Secondly, where as here, there is a party interested in acquiring the Debtor, the opportunity to offer a competing plan is a preferable procedural mechanism to auction for the reasons stated by Judge Ginsburg in *SM 104 Ltd*. Because an approved disclosure statement is a prerequisite to the circulation of a plan and the solicitation of votes, creditors will be able to choose which plan they prefer after having been provided with adequate information sufficient for a "hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." *See* 11 U.S.C. § 1125(a)(1); Fed. R. Bankr.P. 3017(a). Thus, the disclosure statement will provide creditors and stockholders with information so that they can make a decision on whether to bid on the stock, as well as information about the identity of the pro-

---

9. The current proposals for amendments to the Bankruptcy Code, H.R. 833 and S. 65256, do not adopt this recommendation of the NBRC.

ponent and its business plan for the Debtor—significant information where claims are being paid over time. Where the Court is required to consider the preference of creditors in choosing which competing plan to confirm, *see* 11 U.S.C. § 1125(c), and under the circumstances of this case where LMA has indicated its intent to purchase the Debtor's equity interests, the competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan.[10]

## VI. CONCLUSION

In view of the foregoing, the Court hereby grants the Committee's motion to terminate the exclusivity period.[11]

### ORDER

In accordance with the Memorandum dated June 20, 2000 the Court hereby grants the Committee's Motion to Waive Exclusivity Period and overrules the Objection by the Debtor.

---

**10.** The termination of the exclusivity period is not intended to foreclose other interested parties from bidding on the Debtor's equity interest.

**11.** In light of this ruling, it is unnecessary to consider or evaluate the other arguments made by the Committee and LMA in support of termination of the exclusivity period.