### In the Matter of HOMESTEAD PARTNERS, LTD., Debtor.

### Bankruptcy No. A95–76964–WHD.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

June 25, 1996.

John A. Christy, Schreeder, Wheeler & Flint, Atlanta, Georgia, for Debtor.

Sarah Robinson Borders, Darryl S. Laddin, King & Spalding, Atlanta, Georgia, for Condor One, Inc.

## IN PROCEEDINGS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

W. HOMER DRAKE, Jr., Bankruptcy Judge.

### ORDER

Currently before the Court in this proceeding is the Motion for Termination of Exclusivity of Condor One, Inc. (hereinafter "Condor") and a related Motion to Extend Exclusivity by Homestead Partners, Ltd. (hereinafter "the Debtor"). Forming an integral part of the Debtor's Chapter 11 reorganization, these motions give rise to a core proceeding within the Court's subject matter jurisdiction. See 28 U.S.C. § 157(b)(2)(A), (L) & (O). As such, a final disposition of each shall be rendered in accordance with the following reasoning.

### Discussion

The instant controversy forms but one part of an ongoing discord between the Debtor, as owner/operator of a three-hundred unit apartment complex in Clarkston, Georgia, and Condor, the holder of a first priority lien on the Debtor's principal asset. Responding to Condor's acquisition of a receivership over its affairs, the Debtor filed the instant bankruptcy case on November 30, 1995.[1] Subsequently, on March 20, 1996, the Debtor filed a plan of reorganization and related disclosure statement, wherein it separately classifies the secured and unsecured components of Condor's interest and proposes to leave the latter deficiency substantially unpaid.

Notwithstanding its incomplete satisfaction of Condor's claim against the estate, the Debtor also has structured its plan to allow the acquisition of new equity by its former shareholders in exchange for a $500,000.00 capital contribution. Acknowledging its reliance upon a controversial new value "exception" to the absolute priority rule, the Debtor nevertheless professes to have formulated a confirmable plan which merely awaits the solicitation of approving votes. As such, the Debtor has filed its present Motion to Extend Exclusivity, contending that sufficient "cause" exists for continuing its opportunity to seek confirmation without the threat of competing plans.

Responding to the Debtor's plan submission and request for more time, Condor concedes the existence of an exception to the rule of absolute priority, based upon an infusion of new value by former holders of equity.[2] Nevertheless, the creditor vigorously contests the appropriateness of continued ex-

---

1. In the wake of that filing, Condor has submitted a $13,312,268.26 proof of claim. Stipulating to the value of its single asset, the Debtor concedes that $9.5 million of this amount qualifies as a secured claim for purposes of the Bankruptcy Code. See 11 U.S.C. § 506(a). The unsecured portion of Condor's claim, however, remains a subject of dispute due to a claim objection submitted by the Debtor and now pending before the Court.

2. In the instant case, Condor has treated new value as an "exception" to the Code's absolute priority mandate, thereby reserving contest of that doctrine's post-Code survival, yet arguing its instant motion by reference to substantive requirements from pre-Code application. The Court notes that such alternative treatment of the doctrine's vitality and substance might be warranted if the new value principle in fact constituted an uncodified exception to absolute priority, since continued existence of the doctrine then would turn on the extent to which passage of the Code overruled historically accepted doctrine, while any substantive application would remain set by pre-Code practice. Compare, Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (setting out the standard statutes appearing to derogate pre-existing doctrine), with Coones v. Mut. Life Ins. Co. of N.Y., 168 B.R. 247, 254–55 (D.Wyo.1994); In re A.V.B.I., Inc., 143 B.R. 738, 747 (Bankr.C.D.Cal.1992) (treating new value as a circumvention of the codified absolute priority rule). Nevertheless, because the current statute necessarily incorporates a new value principle, the conceptual vitality of that doctrine and the substantive conditions upon which it may be applied have been set by the same stroke of legislative pen and plain meaning. See infra pp. 712–14. Consequently, the same language which makes new value an extant doctrine provides all guidance as to substantive preconditions for its employment, and the two issues may not be divorced.

clusivity, given that the Debtor has filed a reorganization plan which contemplates new value contributions from its former shareholders. Specifically, Condor argues that satisfaction of the new value exception so predicates itself upon the existence of a competitive plan-making environment that, in addition to precluding contemplation of further extensions, the submission of a new value plan automatically warrants termination of the exclusivity period. To that end, Condor has filed a separate Motion for Termination of Exclusivity.

Given the nature of their dispute, the Debtor and Condor agree that settlement of the exclusivity question turns upon an application of the "absolute priority rule," as it has been codified at 11 U.S.C. § 1129(b)(2)(B)(ii) and possibly augmented by a new value exception. The parties having so framed the issue before it, the Court will turn its attention to the intersection of absolute priority with new value, moving therefrom to examine how those combined principles should impact the plan exclusivity decision.

### I. An Introduction to Absolute Priority.

Since the development of consensual reorganizations lies at the heart of Chapter 11 policy, the Bankruptcy Code necessarily incorporates certain measures geared to equalize the bargaining position of debtors vis-a-vis their creditors.[3] Perhaps chief among these efforts to level the reorganizational playing field, the option of "cramdown" allows debtors to pursue the confirmation of their reorganization plans over the dissent of one or more creditor classes, "if the plan does not discriminate unfairly, and it is fair and equitable, with respect to each class that is impaired under, and has not accepted, the plan." See 11 U.S.C. § 1129(b)(1). Laying more definite parameters upon its "fair and equitable" requirement, the Code then elaborates, in pertinent part:

> (2) For the purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> \* \* \* \* \* \*
>
> (B) With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
>
> \* \* \* \* \* \*

11 U.S.C. § 1129(b)(2)(B)(ii). Through this mandate that creditors not receiving full payment must enjoy the consolation of "absolute priority," the Bankruptcy Code's "fair and equitable" provisions codify a pre-Code measure designed to prevent collusion between senior creditors and the holders of pre-bankruptcy equity interests.[4] This act of codifica-

---

3. Ultimately, of course, Chapter 11 involves a process of negotiation, wherein conflicting views of whom should suffer the consequence of the debtor's losses form the bone of contention. As one commentator has noted,

 The methodology for resolving this conflict in Chapter 11 is complex. Loss allocation occurs in a negotiation shaped by competing positions of leverage held by the parties. The positions of leverage in Chapter 11 are defined in part by the debtor's financial insolvency and in part by statutory rules that allocate leverage. The statute determines who has the right to formulate a reorganization plan, the right to convert the case out of Chapter 11, the right to vote to reject the plan, the right to confirm a plan despite rejection, and the right to demand certain minimum financial treatment under the terms of the plan. Each of these rights can have some influence on the eventual terms of a plan. The degree of influence held by each party, however, is both relative and variable. As in any negotiation, the influence of one party is affected by the strength and objectives of the others.

 Raymond T. Nimmer, Negotiated Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions, 36 EMORY L.J. 1009, 1035 (1987).

4. Conceptually speaking, absolute priority finds its roots in a series of railroad cases dating from the turn of the century. See, e.g., Northern Pac. Ry. Co. v. Boyd, 228 U.S. 482, 508, 33 S.Ct. 554, 561–62, 57 L.Ed. 931 (1913) (setting out the first landmark articulation of the absolute priority

tion, however, has proven itself to be a flash-point of controversy, generating much debate and extensive litigation on the validation of related pre-Code practices and the extent to which junior creditors should participate in non-consensual plans of reorganization. In particular, the passage of section 1129(b)(2)(B)(ii) has given rise to concern that this provision of the Code serves to alter, rather than merely to codify, absolute priority's traditional allowance of new stock

purchases by the debtor's former sharehold-ers through contributions of fresh capital, or "new value."[5]

Further compounding the aforementioned debate, the instant case demonstrates that yet a second generation of inquiry will face those courts that acknowledge the continued viability of such new value reorganizations—determining the circumstances under which the new value option may be pursued. For-

rule). Satisfying an immediate need to fight collusion between shareholders and senior credi-tors in equity receiverships, the rule remained an uncodified corollary to the statutory "fair and equitable" requirement governing all cases under Chapter X of the Bankruptcy Act. *See* Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 STAN.L.REV. 69, 74–82 (1991) (providing a painstaking analysis of the doctrine's evolution from basic fraudulent transfer law to its modern form). In recognition of its importance to the reorganization process, Congress ultimately chose to include a shorthand version of the absolute priority rule as part of the current Code's "fair and equitable" requirement. H.R.REP. No 595, 95th Cong., 1st Sess. 414 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6370.

5. At the eye of this section 1129(b)(2)(B)(ii) storm lies a pre-Code practice, whereunder courts had tempered their applications of the uncodified pri-ority rule by employing a tandem doctrine, known as the "new value exception." Pursuant to this "exception," a plan was said to validly permit old stockholders to purchase new equity as part of the debtor's reorganization, notwith-standing absolute priority's mandate, if such a "necessity exist[ed] and the old stockholders ma[de] a fresh contribution and receive[d] in return a participation reasonably equivalent to their contribution." *See Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939); *see also Marine Harbor Properties, Inc. v. Mfr's. Trust Co.*, 317 U.S. 78, 85, 63 S.Ct. 93, 97, 87 L.Ed. 64 (1942). Thus, as a consequence of its new value counterpart, the traditional rule of absolute priority came subject to a qualification, recognizing the potential ne-cessity for capital and consequently permitting junior creditors to buy new equity interests for reasonably equivalent value. *See Mason v. Para-dise Irrigation Dist.*, 326 U.S. 536, 542, 66 S.Ct. 290, 292–93, 90 L.Ed. 287 (1946); *Consolidated Rock Prods. Co. v. DuBois*, 312 U.S. 510, 530 n. 27, 61 S.Ct. 675, 687 n. 27, 85 L.Ed. 982 (1941).

In the process of codifying the absolute priority rule, however, the Code failed to make direct reference to these concepts of "necessity" and "reasonably equivalent contribution" which be-came so familiar to practice under the former Bankruptcy Act. This abnegation, combined with a subsequent refusal by the Supreme Court

to validate its prior allowance for new value reorganizations, consequently has given rise to much debate on whether any "new value" excep-tion survived codification of the absolute priority rule. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203 n. 3, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988) ("[o]ur decision today should not be taken as any comment on the continuing vitality of the *Los Angeles Lumber* exception"); Anthony L. Miscioscia, Note, *The Bankruptcy Code and the New Value Doctrine: An Examination into History, Illusions, and the Need for Competitive Bidding*, 79 VA.L.REV. 917, 921 (1993) (suggesting that, prior to the *Ahlers* deci-sion's noncommitance on the subject, most courts had presumed the continued existence of the new value exception); *see also In re A.V.B.I., Inc.*, 143 B.R. 738, 739 (Bankr.C.D.Cal.1992) (new value is dead); *In re Outlook/Century, Ltd.*, 127 B.R. 650, 656 (Bankr.N.D.Cal.1991) (codifi-cation makes new value a non-viable alternative); *In re Triple R Holdings, L.P.*, 134 B.R. 382, 389 (Bankr.N.D.Cal.1991) (partial codification of ab-solute priority rule did not eliminate new value exception); *Matter of Yasparro*, 100 B.R. 91, 99 (Bankr.M.D.Fla.1989) (the exception has contin-ued vitality). In fact, although much ink has since been devoted to resolution of the question, new value's fundamental viability remains the subject of much conjecture, as that first genera-tion of debate continues to occupy the thoughts of commentators, as well as the courts them-selves. *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership)*, 2 F.3d 899, 906–09 (9th Cir.1993) (finding that new value continues to present a viable doc-trine); *In re Bryson Properties, XVIII*, 961 F.2d 496 (4th Cir.1992) (refusing to comment upon new value's continuing validity); *In re Greystone III Joint Venture*, 948 F.2d 134, 142–44 (5th Cir.1991), *vacated in part*, 995 F.2d 1274 (5th Cir.1991) (initially finding the new value doctrine dead, but subsequently withdrawing that portion of the decision); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1360 (7th Cir.1990) (refusing to comment on the issue); *Piedmont Assocs. v. Cigna*, 132 B.R. 75 (N.D.Ga.1991) (questioning the status of new val-ue); *In re Hickey Properties, Ltd.*, No. 94–10180, 1995 WL 264023, at *4 (Bankr.D.Vt. March 23, 1995) (treating the doctrine's survival as an "open question").

tunately, however, like the basic inquiry demanded by its predecessor, this second generation of debate should find substantial guidance within the plain language of section 1129(b)(2)(B)(ii). *Pennsylvania Pub. Welfare Dep't v. Davenport*, 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) (statutory interpretation must begin with the language's plain meaning); *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989) (when faced with a coherent and consistent statutory scheme, a court should work directly from plain meaning). Thus, in order to determine the circumstances, if any, under which the Code will countenance pursuit of a new value plan, the Court will turn its attention to the text of section 1129(b)(2)(B)(ii) and its mandate of absolute priority in all distributions pursuant to a "cramdown" plan of reorganization.

*A. The Plain Meaning of Section 1129(b)(2)(B)(ii) and Absolute Priority's Impact upon the Confirmability of New Value Plans of Reorganization.*

■ Under a plain meaning analysis, section 1129(b)(2)(B)(ii) parses into two components, each of which must be given effect before any discovery of the statute's plain meaning may be had. *See Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership)*, 2 F.3d 899, 908 (9th Cir.1993) (citing *Negonsott v. Samuels*, 507 U.S. 99, 104–06, 113 S.Ct. 1119, 1123, 122 L.Ed.2d 457 (1993)); *see also Moskal v. United States*, 498 U.S. 103, 109, 111 S.Ct. 461, 465–66, 112 L.Ed.2d 449 (1990) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955) (courts must "give effect, if possible, to every clause and word of a statute") (citations omitted)). First, the plan must provide a junior creditor with some item of "property," in contradiction of strict priority distribution. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). As is the case with similar references throughout the Code, however, section 1129(b)(2)(B)(ii)'s reference to "property" warrants a broad construction, and it consequently should be read to include an option to purchase stock in the reorganized debtor.

*See Bonner Mall*, 2 F.3d at 911 n. 27 (citing *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1360 (7th Cir.1990)); *In re Modern Glass Specialists, Inc.*, 42 B.R. 139, 140–41 (Bankr.E.D.Wis. 1984). Indeed, "[e]ven where the debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains 'property'" as defined by reference to section 1129(b)(2)(B)(ii). *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206–08, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988). Thus, all stock options or acquisitions of the type implicated by new value reorganization constitute "property" as sanctioned by the absolute priority rule.

■ In view of this "property" reference's unwavering applicability to stock distributions, any franchise of new value reorganization under section 1129(b)(2)(B)(ii) necessarily must arise from its secondary mandate—that such equity interests may not be issued "on account of" the recipient's prior interest. Under its uniformly accepted definition, the term "on account of" means simply "because," or "because of" the phrase's prepositional object. *See* WEBSTER'S II NEW RIVERSIDE DICTIONARY 71–72 (3d ed. 1994); *see also* THE OXFORD ENGLISH DICTIONARY 64 (4th ed. 1978) (defining "on account of" to mean "[i]n consideration of, for the sake of, by reason of [or] because of"). Accordingly, the second half of section 1129(b)(2)(B)(ii) serves to inject an element of causation in the analysis of whether junior creditors may take property out of turn. *See* David R. Kuney and Timothy R. Epp, *Aftermath of Bonner Mall: Evolution or Regression in the Notion of "New Value"?*, 5 J.BANKR.L. & PRAC. 211, 229–30 (1996). If former shareholders have retained property "because of" their prior interest in the debtor, then the associated plan of reorganization violates absolute priority, and it stands unconfirmable as a matter of law. *See In re Bryson Properties, XVIII*, 961 F.2d 496, 504 (4th Cir.1992); *In re A.V.B.I., Inc.*, 143 B.R. 738, 740–41 (Bankr.C.D.Cal.1992); *In re Outlook/Century, Ltd.*, 127 B.R. 650 (Bankr. N.D.Cal.1991). By the same token, however, if the holder of a junior interest is granted an option to purchase new equity, and acqui-

sition of that property right bears no causal connection to a prior interest in the debtor, then· the plan fulfills the directive of the absolute priority rule as it has been codified by the Bankruptcy Code.[6] *Bonner Mall,* 2 F.3d at 909 (noting that in such cases old equity takes nothing "on account of" its prior interest); *In re Snyder,* 967 F.2d 1126, 1130 (7th Cir.1992) (conceding that "when owners infuse necessary value into the enterprise . . . the source of their retained interest is not their prior ownership, but rather their new contribution"); *In re U.S. Truck Co., Inc.,* 800 F.2d 581, 588 (6th Cir.1986); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. Partnership (In re Woodscape Ltd. Partnership),* 134 B.R. 165, 172–74 (Bankr.D.Md.1991).

### B. Applicability of the Traditional "Necessity" and "Reasonable Value" Standards to Section 1129(b)(2)(B)(ii)'s Causation Analysis.

Since the plain meaning of section 1129(b)(2)(B)(ii) highlights causation as a linchpin to the confirmability of new value

plans, satisfaction of the absolute priority rule will require substantial effort in uncovering the true impetus to old equity's involvement. In this respect, the concepts of "necessity" and "value," which became so ingrained as part of the pre-Code new value exception, lend themselves as an invaluable corollary to the implementation of section 1129(b)(2)(B)(ii) by providing accurate barometers of the cause behind shareholder involvement.[7]

■ For instance, courts applying the "absolute priority" mandate should inquire into the debtor's necessity for selling new equity, since such an examination promises to reveal whether the sale comes as a product of some independent motivation beyond a pure desire to benefit old equity. *See In re SM 104, Ltd.,* 160 B.R. 202, 226 (Bankr.S.D.Fla.1993); *In re Sovereign Group 1985–27, Ltd.,* 142 B.R. 702, 708–09 (E.D.Pa.1992); *In re Mortgage Inv. Co. of El Paso, Tex.,* 111 B.R. 604, 619 (Bankr.W.D.Tex.1990) (noting the value and purpose of such a "business necessity" analysis). Thus, as was the case under pre-Code practice, an examination of business

6. The Court acknowledges that such reliance upon the plain terms of section 1129(b)(2)(B)(ii) would be inappropriate if it produced consequences demonstrably at odds with congressional intent. *United States Nat'l Bank of Ore. v. Independent. Ins. Agents of Am., Inc.,* 508 U.S. 439, 462, 113 S.Ct. 2173, 2186, 124 L.Ed.2d 402 (1993); *Hallstrom v. Tillamook County,* 493 U.S. 20, 28, 110 S.Ct. 304, 309–10, 107 L.Ed.2d 237 (1989). Nevertheless, the legislative history behind section 1129(b)(2)(B)(ii) in no way suggests an intent to codify an absolute priority rule which does not make allowance for new value contributions. *See Snyder,* 967 F.2d at 1129 (finding nothing in the legislative history to undermine the ongoing viability of the new value exception); *see also Triple R Holdings,* 134 B.R. at 387–91 (reaching a similar conclusion after thoroughly examining all relevant statements of congressional intent). Consequently, the Court finds nothing in the statements of the section's drafters to militate against a full reading of absolute priority's "on account of" qualification. *United States Dep't of Treasury v. Fabe,* 508 U.S. 491, 504 n. 6, 113 S.Ct. 2202, 2210 n. 6, 124 L.Ed.2d 449 (1993); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 35–36, 112 S.Ct. 1011, 1015–16, 117 L.Ed.2d 181 (1992) (courts must construe statutory mandates in a fashion that gives operative effect to each term or phrase).

7. Undeniably, by relying upon the same "necessity" and "reasonable value" concepts found within the traditional new value doctrine, bankruptcy

jurisprudence appears to have come full circle in several respects. The Court finds it necessary to observe, however, that the introduction of these concepts does not arise from a choice to embrace the pre-Code "exception" out of policy concerns, some pragmatic need to limit absolute priority, or new value's independent status as a part of an historically accepted doctrine. To the contrary, the need to examine "necessity" and "reasonableness" of value comes as a consequence of section 1129(b)(2)(B)(ii)'s plain language and, in particular, the means by which it makes causation the turning point of absolute priority. In this respect, the Court concurs with a distinguished majority that has found the doctrine's traditional elements to be a corollary of section 1129(b)(2)(B)(ii)'s plain terms. *See, e.g., Bonner Mall,* 2 F.3d at 906; *In re SM 104, Ltd.,* 160 B.R. 202, 225 (Bankr.S.D.Fla.1993) (Ginsberg, B.J.); *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324, 343–44 (Bankr. S.D.Ohio 1992); *In re Creekside Landing, Ltd.,* 140 B.R. 713, 717 (Bankr.M.D.Tenn.1992); *Woodscape,* 134 B.R. at 168; *see also* Elizabeth Warren, *A Theory of Absolute Priority, Annual Survey of American Law: Proceedings and Papers of a Bankruptcy Law Symposium* (Apr.1991); Miscioscia, 79 VA.L.REV.. at 921; Markell, 44 STAN.L.REV. at 96–98; Nimmer, 36 EMORY L.J., at 1009.

necessity should weigh heavily in the testing of a new value plan's confirmability.

Nevertheless, matters of "business necessity" merely answer the foundational question of why the debtor has chosen to transfer away its property via sale. Such an inquiry does not provide an answer to the ultimate question posed by section 1129(b)(2)(B)(ii)—how and why the old shareholders ultimately came to be purchasers in the equity-vending transaction. To that end, in surmounting its burden under section 1129(b)(2)(B)(ii), the proponent of a new value plan must establish not only the existence of the debtor's "business necessity" for capital, but also the fact that selling the new equity to former shareholders presents the most feasible means of satisfying its need for cash. *See Bonner Mall,* 2 F.3d at 911 n. 30 ("the prior shareholders must be the 'most feasible source of the new capital' ") (quoting *Case,* 308 U.S. at 121 n. 15, 60 S.Ct. at 10 n. 15); *In re Potter Material Serv., Inc.,* 781 F.2d 99, 102 (7th Cir.1986); *In re Bjolmes Realty Trust,* 134 B.R. 1000, 1010 (Bankr. D.Mass.1991).

In a related fashion, the nature and amount of consideration paid should offer a key signal of the cause behind shareholder involvement. If, for whatever reason, old equity seeks to purchase shares in the reorganized debtor and offers to pay a competitive price in exchange, then little doubt can exist that the reasonableness of their offer "caused" the former shareholders to receive the property in question. *Woodscape,* 134 B.R. at 173. By the same token, however, if the shareholders acquired an equity interest at a bargain or discounted rate, a presumption should arise that they have taken property "on account of" their former interest rather than by qualification as the most feasible buyer. *SM 104,* 160 B.R. at 226 ("if the plan purports to give the debtor's prepetition owners the equity interests ... at a bargain price, [they] will be receiving something 'on account of' their prepetition ownership"). Consequently, the quantum of payment offered by old shareholders, as compared with the value of equity they propose to acquire, must form a key point of inquiry as the court searches for an independent cause of share-

holder participation. *See Bonner Mall,* 2 F.3d at 908; *U.S. Truck,* 800 F.2d at 588; *Potter Material,* 781 F.2d at 102.

In sum, based upon the plain language of section 1129(b)(2)(B)(ii)'s absolute priority rule, an option to purchase stock under a new value plan constitutes "property" as proscribed by that section's mandate. Such a plan, however, does not violate absolute priority unless the property also has been given "on account of" the recipient's former interest, i.e., because of the buyer's status as a former shareholder. In a pivotal stream of analysis, therefore, courts must examine the reason for shareholder involvement, focusing upon the fundamental "business necessity" of the equity sale, the extent to which a purchase by the old shareholders poses the most feasible option, and the extent to which old equity has offered to pay full value for the rights to be acquired. If, by producing firm evidence regarding each of these considerations, a plan proponent can prove that the shareholders' involvement arises from a cause independent of their former interest, then the plain meaning of the absolute priority rule is not violated. *See Bonner Mall,* 2 F.3d at 908; *SM 104,* 160 B.R. at 225; *Woodscape,* 134 B.R. at 173; *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324, 343 (Bankr. S.D.Ohio 1992).

## II. Terminating Exclusivity for "Cause" in Light of a New Value Plan's Submission.

Having so forecast the evidentiary burden facing the proponent of a new value plan at confirmation, the Court now must turn its attention to the question of exclusivity and, in particular, whether the presence of a non-competitive plan-making environment poses an insurmountable barrier to satisfaction of those criteria. Exclusivity may be terminated or extended "for cause," as determined at the Court's discretion. *See* 11 U.S.C. § 1121(d). Thus, if a confirmable plan may be reached only through the termination of the exclusivity period, such a measure should find ample justification in the policy as well as the text of the Bankruptcy Code. *See United Sav. Ass'n v. Timbers of*

*Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (inability to develop confirmable plan constitutes "cause"); *SM 104*, 160 B.R. at 207 n. 45 (suggesting that submission of a new value plan constitutes such "cause"); *see also* Elizabeth Warren, *A Theory of Absolute Priority, Annual Survey of American Law: Proceedings and Papers of a Bankruptcy Law Symposium* 35 (Apr.1991); Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 STAN. L.REV. 69, 118–19 (1991). From this standpoint, the existence of "cause" by which to terminate exclusivity ultimately distills down to two key issues: (1) whether notions of exclusivity or non-competition are pragmatically inapposite with the showing of independent causation demanded by section 1129(b)(2)(B)(ii); and (2) if the mandatory showings of "necessity" and "value" do necessitate some atmosphere of competitive bidding, whether that need may best be cured by ending the debtor's exclusive opportunity at plan formulation.

### A. Non–Competition as an Insurmountable Barrier to the Confirmation of a New Value Plan.

Given the evidentiary showing of "necessity" and "reasonable value" which a proponent must make prior to confirmation of its non-consensual plan, the Court has little doubt that some environment of competitive bidding must accompany the sale of new equity in the reorganized debtor. First, if the viability of a new value plan turns on its purchaser's having paid top dollar, or reasonably close thereto, for the interest it will acquire, it stands to reason that the underlying offer must have been tested through some comparative pricing scheme. Absent competitive bidding, no certainty may be had regarding the market value of the new equity interest which the plan proposes to sell. Consequently, a plan that allows shareholders to purchase new equity without also exposing the offer to competition in the marketplace will subject its proponent to an insurmountable burden of evidentiary proof under section 1129(b)(2)(B)(ii) when confirmation rolls around. *In re BMW Group*, 168 B.R. 731, 735 (Bankr.W.D.Okla.1994) (such a plan is not "fair and equitable," for no one knows what the equity interest would bring on the open market or even what the purchaser himself would be willing to pay if pressed).

Such concerns ring uniquely true with respect to the intangible benefits of owning the reorganized debtor. As the Court previously has noted, confirmability hinges upon a showing that the purchaser has given full value for all rights acquired, including those intangibles which escape the net of accepted valuation standards. *See Te-Two Real Estate Ltd. Partnership v. Creekstone Apartments Assocs., L.P. (In re Creekstone Apartment Assocs.)*, No. 3:94–0382, 1995 WL 588904, at *14 (M.D.Tenn.) ("[i]ntangibles such as control and the right to manage the business have a value that must be included in this equation"); Markell, 44 STAN.L.REV., at 100 (noting the difficulty of factoring in "[n]onoperational reasons, such as tax incidents of ownership or sentimentality, which increase the allure of continued ownership"); Warren, 1991 ANN.SURV.AM.L., at 20–22 (detailing a variety of intangibles which might lead old equity to pay more, but noting that, "if there is no reason to bid that higher valuation, the owner/manager will not do so"); *U.S. Truck*, 800 F.2d at 588 (riskiness and prospects for return on investment must be considered). Other than a blind guess from the Court,[8] exposure to a competitive bidding environment poses the only possible means by which to account for these factors in the calculus of valuation. *See* Michael H. Strub, *Competition, Bargaining, and Exclusivity Under the New Value Rule:*

---

8. Absent competition, any application of the new value exception naturally will call for a series of educated guesses by the Court. Markell, 44 STAN. L.REV., at 100. This reliance upon guesswork, however, loses whatever factual anchoring it once had as the setting of value becomes increasingly dependent on the value of intangibles. Naturally, in such circumstances, courts would find themselves forcefully tempted to set new equity's value at whatever the former shareholders should offer. *Bjolmes*, 134 B.R. at 1008. Such an approach, however, invites old equity to bid well below its own perceived value. Markell, 44 STAN.L.REV., at 101 ("[o]wners can bid low and seek to bluff creditors as to reorganization value").

*Applying the Single Asset Paradigm of Bonner Mall,* 111 B.L.J. 228, 240 n. 121 (1994) ("a competitive market is the only mechanism to insure that all value is transferred to creditors in a new value plan and that [the purchaser] is not using the bankruptcy process to get a bargain"). Thus, a plan proponent who sells new equity via exclusive option will find himself incapable of proving that he has captured the full value of a key component to the interest which he proposes to transfer.

Similarly, a proponent of a new value plan whose sale has not been tested in the marketplace cannot demonstrate "necessity" as required by section 1129(b)(2)(B)(ii). As previously noted, in order to demonstrate that its new found property rights have not been acquired "on account of" its former interest, old equity must be proven to be the most feasible source of new capital. *Bonner Mall,* 2 F.3d at 911 n. 30 (citing *Case,* 308 U.S. at 121 n. 15, 60 S.Ct. at 10 n. 15). Common sense, therefore, dictates that some competing offer must exist, so as to provide a reference point in making that determination. *Bjolmes,* 134 B.R. at 1010 ("as observed in *Los Angeles Lumber,* stockholders are allowed to retain their stock for the new contribution because they 'may' be 'the only or most feasible source of the new capital' . . . that presumption should be tested in the market.") (citations omitted). Indeed, to find an exclusive option holder "most feasible" would necessitate an exercise in the ridiculous, much like declaring the victor in a one-horse race or crowning the winner in a single-entrant beauty pageant.

In sum, cultivating new equity purchases in a non-competitive environment leaves the plan proponent unable to make either of the showings necessary to prove that the stock distribution has not come "on account of" old equity's prior interest. Considered as such, the presence of an exclusive opportunity to buy stock in the reorganized debtor reveals itself as a de facto violation of absolute priority[9] and an insurmountable barrier to confirmation. *See Bryson,* 961 F.2d at 504 (exclusive option violates absolute priority); *BMW Group,* 168 B.R. at 735 (exclusivity means a grant of property "on account of" former interest); *SM 104,* 160 B.R. at 227 n. 45; *Bjolmes,* 134 B.R. at 1006; *In re Ropt Ltd. Partnership,* 152 B.R. 406, 412–13 (Bankr.D.Mass.1993); *Outlook/Century,* 127 B.R. at 653–54; *see also* Anthony L. Miscioscia, Jr., Note, *The Bankruptcy Code and the New Value Doctrine: An Examination into History, Illusions, and the Need for Competitive Bidding,* 79 VA.L.REV. 917, 946 (1993).

### B. Tearing Down the Barrier of Non-competition—The Choice Between Mandatory Auctions and Terminating Plan Exclusivity.

Like its view of non-competition's fatal impact on new value reorganization, the Court finds Condor's second argument, that terminating plan exclusivity would solve such problems, to be well seated in reason. Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the share-

9. On this point, the Court finds that it respectfully must take issue with a contrary handling of the exclusivity question by the Ninth Circuit Court of Appeals. *See Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership),* 2 F.3d 899 (9th Cir.1993). Noting that an *exclusive option is no more an item of property* than its non-exclusive counterpart, the court in *Bonner Mall* concluded that the existence of a non-competitive environment should not give rise to a violation of the absolute priority rule. *Id.* at 911 n. 27. Through this aspect of its decision, however, the *Bonner Mall* court failed *to give recognition to the real world impact of* exclusivity upon new value reorganization. While exclusivity in bidding has no effect upon the proprietary character of the interest obtained under a new value plan, it does have a debilitating impact upon the plan's confirmability, in that it leaves the proponent unable to establish "necessity" and "reasonable value." As a consequence of this practical impairment, the presence of an exclusive environment condemns the associated plan to a fate of non-confirmability for having failed to meet section 1129(b)(2)(B)(ii)'s mandate of independent causation. *See BMW Group,* 168 B.R. at 735 (gives property "on account of"); *SM 104,* 160 B.R. at 227 n. 45; *Bjolmes,* 134 B.R. at 1006. Thus, the presence of a non-competitive environment constitutes a de facto violation of absolute priority, notwithstanding *Bonner Mall*'s valid analysis of its proprietary functions.

holder's offer. *See SM 104*, 160 B.R. at 207 n. 45; *see also* Warren, 1991 ANN.SURV.AM.L., at 35; Markell, 44 STAN.L.REV., at 118–19. As such, putting an end to the Debtor's exclusive plan-making rights merits consideration as one means by which to solve the non-competition problem.

Merely concluding, however, that the burdens of plan confirmation require that some competitive environment attend new equity purchases will not by itself justify exclusivity's termination. Rather, in keeping with section 1121(d)'s requirement of "cause," *see* 11 U.S.C. § 1121(d), competitive plan formulation must be found to offer the most viable means by which to introduce necessary market forces as part of the bidding process. *See, e.g., In re Colorado–Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 175 (Bankr.D.Col.1990); *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 156–61 (Bankr.D.Me.1982) (curtailing the debtor's exclusivity period only after evaluating other potential corrective measures). Thus, before making any decision on the Motion to Terminate, the Court must examine the feasibility of alternative means for curing the fatal ailment of non-competition. *See* Miscioscia, 79 VA.L.REV., at 948 (suggesting that terminating plan exclusivity does not constitute the sole means by which to inject competition into the new value picture).

In this respect, it becomes necessary to consider the *Bjolmes* auction approach. At least implicitly discounting the need for competing plans, Judge Queenan has suggested that the demand for competitive bidding may be cured at the point of confirmation, by conditioning plan approval upon an auction of the new equity interest. *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1010–12 (Bankr. D.Mass.1991). Moreover, to the extent that it poses an appealing alternative to culminating exclusivity, many within the bench and bar have espoused the *Bjolmes* auction as the theoretical cure for new value's non-competition problems. *See SM 104*, 160 B.R. at 227 (noting that such an auction would be "the ideal method for measuring the fairness of the price paid for the equity in the reorganized debtor"); *see also* Miscioscia, 79 VA. L.REV., at 951 (describing such an auction as a "second and perhaps better way in which courts can ensure adherence to the strictures of the absolute priority rule"); John T. Bailey, *The "New Value Exception" in Single–Asset Reorganizations: A Commentary on the Bjolmes Auction Procedure and its Relationship to Chapter 11*, 98 COM.L.J. 50, 66–70 (1993).

Notwithstanding their endorsement in theory, however, many potential advocates of the *Bjolmes* auction approach find it to run aground in practice, due to certain state and federal securities law regulations. *See SM 104*, 160 B.R. at 227; *see also* Kuney & Epp, 5 J.BANKR.L. & PRAC., at 251. The Securities Act of 1933 (hereinafter "the 1933 Act") imposes extensive registration requirements [10] upon all offers to sell, as well as sales and deliveries arising from a transaction in securities. *See* 15 U.S.C. § 77e (making it unlawful to use the mail or any mode of interstate commerce to sell an unregistered security). Likewise, Georgia statutory authority makes it unlawful for any person to sell securities or offer to sell securities without an effective registration with the State. *See* O.C.G.A. § 10–5–5. Naturally, therefore, the sort of bidding invitation contemplated by *Bjolmes* might appear to call for registration,[11] a process whose cost and overall burden to the estate would distance the auctioning option from the realm of reasonable consideration.

---

**10.** In addition to suffering the consequences of the transaction's recision and the possibility of criminal prosecution, violators of these state and federal registration requirements may find themselves the subject of a civil damage award. *See* 15 U.S.C. § 77b(3); *see also Lawler v. Gilliam*, 569 F.2d 1283, 1287 (4th Cir.1978).

**11.** Bankruptcy Code section 1145 does provide the following limited exemption from the registration requirements of state and federal securities laws:

(a) Except with respect to an entity that is an underwriter as defined in subsection (b) of this section, section 5 of the Securities Act of 1933 and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security do not apply to—

(1) the offer or sale under a plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan—

(A) in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; or

 Such a shorthand dismissal of the *Bjolmes* auction approach, however, fails to account for *its possible exception from registration under the securities laws' own exemptive provisions*. As section 4 of the 1933 Act points out, no registration must be made of "transactions by an issuer not involving any public offering." *See* 15 U.S.C. § 77d(2). Moreover, in contrast to lay usage of the term, the "public" character of a securities offering under the 1933 Act does not turn on the mere numerical size of its recipient group. *See Wheaten v. Matthews Holmquist & Assocs., Inc.*, 858 F.Supp. 753, 757 (N.D.Ill. 1994). To the contrary, courts determine the occurrence of "public offering" by reference to the qualitative characteristics of the offeree group, and specifically, whether those prospective purchasers need the protections of the registration process. *Mark v. FSC Sec. Corp.*, 870 F.2d 331, 333 (6th Cir.1989) (citing *Securities & Exchange Comm'n v. Ralston Purina Co.*, 346 U.S. 119, 125, 73 S.Ct. 981, 984–85, 97 L.Ed. 1494 (1953) (a non-public offering is "[a]n offering to those who are shown to be able to fend for themselves"). Thus, transactions involving a finite group of sophisticated investors with independent access to the sort of financial information disclosed by registration do not involve any "public offering" and should enjoy exemption from the 1993 Act's registration requirements. *See United States v. Lindo*, 18 F.3d 353, 358 (6th Cir.1994); *Ackerberg v. Johnson*, 892 F.2d 1328, 1337 (8th Cir.1989) ("[i]f the offerees have access to such information, registration is unnecessary") (citations omitted); *Sorrell v. S.E.C.*, 679 F.2d 1323, 1326 (9th Cir.1982) ("[t]he offeree's access to financial information . . . is crucial").

 In view of these considerations, the Court has no doubt that a *Bjolmes*-type auction, with participation limited to existing creditors of the reorganizing debtor, would qualify as an exempted private placement of stock for the purposes of securities law's registration requirements. Through its plan submission and disclosure statement rules, the Chapter 11 process serves to make participating creditors acutely aware of the debtor's financial affairs and intentions, perhaps even to a higher degree than a registration and prospectus would provide such information to a generic investor. *Compare* 11 U.S.C. § 1125; FED.R.BANKR.P. 3017 (relating to the requirement and sufficiency of a disclosure statement), *with* 15 U.S.C. § 77f; 17 C.F.R. § 210.1–01 et seq. (setting forth the requirement of a financial statement, accountant's reports, consolidated balance sheets, etc., as the substantive disclosure required for registration). Additionally, by confining its invitation to existing creditors, a *Bjolmes* auction would limit involvement to a group having pre-existing contact and familiarity with the debtor's affairs, as well as a level of business sophistication exceeding that of the average individual investor. In short, as a transaction limited to parties "who can fend for themselves," a *Bjolmes* auction constitutes a "non-public offering" [12] and accordingly should be exempted from registration [13] under applicable securities laws. *See Ralston Purina Co.*, 346 U.S. at 125, 73 S.Ct. at 984–85; *see also Weprin v. Peterson*, 736 F.Supp. 1124, 1128–30 (N.D.Ga.1988) (Shoob, J.) (offering found exempt as private placement where fewer than

---

(B) principally in such exchange and partly for cash or property

\* \* \* \* \* \*

11 U.S.C. § 1145(a). Nevertheless, because the section 1145 exemption applies only to stock issuances in exchange for a claim or preceding interest in the debtor, any new value reorganization meeting its terms necessarily will run afoul of the absolute priority rule's mandate that no property be retained "on account of" such a prior interest. Thus, a valid and confirmable new value plan will find no safe harbor within the text of section 1145's exemptive provisions.

**12.** Georgia law contains a similar provision exempting private placements, such as that contemplated by a *Bjolmes* auction, from its registra-

tion requirements. *See* O.C.G.A. § 10–5–9(13) (stock transactions with less than twelve in-state purchasers that do not involve any mode of public advertisement or solicitation need not be registered pursuant to O.C.G.A. § 10–5–9).

**13.** While saving the Debtor the cost and effort of registration, the Court notes that qualifying the auction-related transaction as a "private placement" will have certain consequences. Specifically, both state and federal law will restrict the ability of anyone purchasing stock through such a non-public offering to resell that interest in the near term. *See* 17 C.F.R. § 230.144; *see also* O.C.G.A. § 10–5–9(13)(C), (D). Nevertheless, such limitations should have no impact upon the appeal of the interest to be sold or the value

415 offers were made, each offeree had prior relationship with dealer, offerees had full access to financial information, and no solicitation was made to the general public).

█ That said, the *Bjolmes* auction presents a validly alternative means by which to inject the necessary element of competition into the new value process. *See In re Hickey Properties, Ltd.,* No. 94–10180, 1995 WL 264023, at *4 (Bankr.D.Vt. Mar. 23, 1995); *In re Ropt Ltd. Partnership,* 152 B.R. 406, 412–13 (Bankr.D.Mass.1993); *In re Bjolmes Realty Trust,* 134 B.R. 1000, 1010–12 (Bankr. D.Mass.1991). Moreover, since a confirmation-point equity auction serves to accomplish this task without otherwise disrupting the plan negotiation process, it presents a cure of demonstrably more appealing character than

captured by the auction process. Purchasers wishing to divorce themselves from their investment prior to expiration of those restricted periods simply may cause the Debtor to sell its single asset, distributing any proceeds via dividend and subsequently dissolving the corporation.

14. The debtor's exclusive opportunity at plan formulation is a key element in the delicate balance struck by Congress to encourage the consensual development of reorganization plans. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 1188 (1978) (noting exclusivity's role in giving the debtor sufficient leverage by which to negotiate a compromise with its creditors). With this exclusive opportunity comes a panoply of rights serving to equalize the relative bargaining position of the debtor and his creditors. *See* Nimmer, 36 Emory L.J., at 1041 (noting the manner in which exclusivity permits the debtor to influence the terms of reorganization by classifying creditors for payment, voting, and cramdown purposes, as well as the way in which it empowers the debtor to negotiate financial terms). While sufficing to inject a competitive element in the new value process, ordering the termination of plan exclusivity would upset this balance of rights and powers, taking most of the debtor's negotiating leverage away from him and thereby diminishing all hope of consensually resolving the reorganization.

By contrast, pursuing a *Bjolmes* auction allows the Court to resolve the non-competition problem without disrupting the Chapter 11 balance of power. To that end, it offers a cure without the adverse side effects of terminating exclusivity, as well as a solution more narrowly confined to serving the need for competing bids. In light of these considerations, the auction alternative poses a much more appealing means for curing the non-competition problems facing new value reorganizations.

its exclusivity-terminating counterpart.[14] Notwithstanding its agreement that some method of competition must be introduced in this case, the Court, therefore, finds no cause by which to justify terminating the plan exclusivity period. *Cf.* 11 U.S.C. § 1121(d) (exclusivity shall be terminated only upon a showing of "cause"). Instead, any confirmation order handed down in this case merely shall come subject to a contingent requirement that the new equity interest be held out for auction, with each creditor given the opportunity to vie for control of the reorganized debtor by entering its own competing bid.[15]

## III. The Debtor's Motion to Extend Plan Exclusivity.

█ Having so disposed of Condor's Motion to Terminate, the Court also must

15. On a related point, the Court must address the issue of Condor's right to credit bid in the course of the aforementioned auction. Were this a sale of the rental complex itself, Condor would have an undisputed right to credit bid the full amount of its claim in lieu of tendering cash. *See* 11 U.S.C. § 363(k); *see also Aetna Realty Inv., Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.),* 166 B.R. 428, 433 (C.D.Cal. 1993); *H & M Parmely Farms v. Farmers Home Admin.,* 127 B.R. 644, 648 (D.S.D.1990). Nevertheless, in a *Bjolmes*-type auction, ownership of the collateral itself stays with the Debtor at all times and is never passed to the hands of another party. Thus, to the extent that such an auction contemplates a sale not of the collateral, but of the independent right to control the Debtor in the post-bankruptcy world, the terms of the Code provide no basis for vesting Condor with such a right to bid on credit.

Aside from its lack of any statutory support, allowing credit bids would inequitably skew the auction process in favor of dominant creditors like Condor. As one commentator has noted in this respect:

[I]f the secured creditor prevailed in the auction using a credit bid above the amount of its [allowed secured claim], it would gain value for its [allowed unsecured claim] while other unsecured creditors would receive nothing on their claims. Since in typical single-asset cases the secured creditor's [allowed unsecured claim] dwarfs other unsecured claims, credit bidding would allow it to exceed the bids of any other bidder, even to a point far above the value it actually perceives in the asset.... [T]his is a potentially deleterious effect that tilts the auction process irretrievably toward large secured creditors, thus undercutting the usefulness of the auction.

John T. Bailey, *The "New Value Exception" in Single–Asset Reorganizations: A Commentary on*

address the Debtor's related Motion to Extend Exclusivity. As previously noted, the Code makes allowance for such extensions, based upon a showing of "cause." *See* 11 U.S.C. § 1121(d). While the Debtor bears the burden of making such a showing, "cause" may be found in a variety of factors. *In re Curry Corp.*, 148 B.R. 754, 755 (Bankr. S.D.N.Y.1992); *In re Crescent Mfg. Co.*, 122 B.R. 979, 982 (Bankr.N.D.Ohio 1990). Particularly relevant to the instant case, sufficient "cause" may exist when the debtor has made substantial progress toward gaining acceptance of its plan; *Gaines v. Perkins (In re Perkins)*, 71 B.R. 294, 298 (W.D.Tenn. 1987); when recalcitrance of certain creditors has posed a significant hurdle to timely plan development, *Texas Extrusion Corp. v. Lockheed Corp.*, 844 F.2d 1142, 1160 (5th Cir. 1988) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977)); or when the presence of complex legal issues has occupied much of the debtor's plan-making opportunity. *Perkins*, 71 B.R. at 298. Given the presence of each aforementioned consideration in the case before it, the Court, therefore, finds cause by which to justify a limited extension of the exclusivity period, thereby permitting the Debtor to negotiate approval of its reorganization plan.

## Conclusion

Due to the evidentiary showings of "necessity" and "reasonable value" that the proponent of a new value reorganization must make in order to satisfy 11 U.S.C. § 1129(b)(2)(B)(ii), the Court finds that some competitive bidding environment must accompany such new value's development and presentation. Nevertheless, since an equity auction at the point of confirmation offers an equally effective and less disruptive means to that necessary end, the Debtor's plan exclusivity rights need not be terminated so as to open the process to competition. The Court having found no cause by which to justify such exclusivity-terminating measures, it hereby is **ORDERED** that the Motion for Termination of Exclusivity by Condor One, Inc. is **DENIED**.

At the same time, the Debtor has made substantial progress towards obtaining acceptance of its plan, and most likely would have already completed the plan approval process but for Condor's high degree of recalcitrance and the presence of certain complex legal issues. That said, ample cause exists so as to justify a limited extension of the exclusivity period. It is **FURTHER ORDERED** that the Motion to Extend Exclusivity of Homestead Partners, Ltd. is **GRANTED**. Pursuant to the terms of 11 U.S.C. § 1121(d), the Debtor shall have an additional sixty (60) days of plan exclusivity from and after the entry of this Order.

**IT IS SO ORDERED.**

the *Bjolmes Auction Procedure and its Relationship to Chapter 11*, 98 Com.L.J. 50, 72 (1993). Since the lion's share of any capital contribution made by it would be returned as a consequence of the pro-rata distribution process, such a dominating undersecured creditor already holds an edge over competing purchasers. To permit credit bidding would only shift this process further to the side of the dominant creditor, without any basis in reason or equity. *Bjolmes*, 134 B.R. at 1010 n. 22.

Perhaps more importantly, the Court notes that allowing Condor to credit bid its entire claim would undermine substantially the premise upon which the auction finds justification. As previously noted, the *Bjolmes* auction gains its impetus from a desire to introduce competition, and specifically, a need for some objective reference by which to determine whether old equity is paying market value for its proposed acquisition. Allowing Condor to credit bid would counter-

mand this value-assessing function, since the old shareholders would bid with cash money while their main competitor spent a currency of no consequence. As the above-quoted commentator suggests, a credit-bidding Condor would have every incentive to bid above its own perceived value for that equity interest, making the resulting offer worthless as a reference point for determining the true value of the new equity interest. In short, an auction making allowance for credit bids would place the Court right back where it began, questioning whether the former equity-holders had proposed to pay reasonable value in the first place, and speculating whether the Debtor's plan had met the standards of section 1129(b)(2)(B)(ii) as originally proposed. To prevent such a contravention of the purpose behind this auction, the Court will require Condor to bid on the same terms as the former shareholders, in *cash or its equivalent*.